## Case No. 1,464.

BLACK et al. v. SCOTT et al.

[2 Brock. 325.][1]

Circuit Court, D. Virginia. June 30, 1828.

EXECUTORS AND ADMINISTRATORS — DEMANDS AGAINST ESTATE—CLAIM OF WARD — PRIORITY— STATUTE OF WILLS — MEANING OF "ESTATE"— LIEN OF WARD—EQUITABLE CONVERSION.

1. The proceeds of the sale of the real estate of J. L., deceased, constituting a very large fund, being in the hands of the federal court, for distribution among his creditors, the executor of W. L. M., a ward of J. L., moved the court for an order that he should receive the amount of the ward's claim against J. L.'s estate, which had been established by a decree of the court of chancery for the state of Virginia. The fund in possession of the court being inadequate for the payment of all the debts of J. L., deceased, for which his real estate was bound, the executor of the ward claimed the whole amount of the debt due to his testator, both as a creditor by bond (the guardian having given a bond in which his heirs were bound), and by virtue of the acts of assembly of Virginia, in such cases provided. By the law of Virginia, it is provided, that the "estate of a guardian or curator, appointed under this act, not under a specific lien, shall, after the death of such guardian or curator, be liable for whatever may be due from him or her, on account of his or her guardianship, to his or her ward, before any other debt due from him or her" (see act concerning guardians, &c., 1 Rev. Code, c. 108, § 12, p. 408), and that "the executors or administrators of a guardian, of a committee, or of any other person, who shall have been chargeable with, or accountable for the estate of a ward, an idiot, or a lunatic; or the estate of a dead person, committed to their testator or intestate, by a court of record, shall pay so much as shall be due from their testator or intestate, to the ward, idiot, or lunatic, or to the legatees, or persons entitled to distribution, before any proper debt of their testator or intestate" (see act concerning wills, intestacy, and distributions, Id. c. 104, § 60, p. 389). The will of J. L., contained the following clauses:—"In the first place, I desire that all my just debts may be paid, and for this purpose, I subject my whole estate, real and personal. In case it should be necessary for the purpose of paying my debts, I give to my executors, after named, the power of so doing," "and authorize my said executors, or such of them as may act, to make conveyances to the purchaser or purchasers." "All the rest and residue of my estate, after the payment of my debts and legacies as aforesaid, I give to my two children, Andrew and Jane." The devisees of the residue, were his heirs at law. Held: 1. That the 12th section of the law concerning guardians, &c., and the 60th section of the act concerning wills, &c., having both been passed at the same session of the legislature, and being in pari materia, must be considered in connexion as if they were parts of the same act; that the latter section applies only to executors and administrators, in the administration of the effects of their testator or intestate, that come to their hands in their official character, giving priority to debts due to a ward, an idiot, a lunatic, or the estate of a dead person, &c., over all others, but placing them all on the same footing with reference to each other.

2. That the word estate, in the 12th section, concerning guardians, &c., must be construed to apply only to the real estate of the guardian, for if it were applicable to the personalty also, it would give the ward the priority on the personal estate, over persons who are, by the section respecting wills, &c., expressly placed on

─────────────────────────────
[1] [Reported by John W. Brockenbrough, Esq.]

an equal footing with him. But this act gives the priority to the debt due to the ward, to any bond debt due from the testator or intestate, on his own account.

3. But this statute does not create a lien on the lands of the guardian, for that would bind them in the hands of a purchaser. To give it such an interpretation, would violate the general policy of the law, in setting up a secret lien, in restraint of alienations, and is not required, either by the express words of the act, or any necessary construction of it. But

4. Although this act does not create a lien on the guardian's lands, it does create a liability of the heir, or devisee, to pay the debt due to the ward on guardianship account, in consideration, and to the amount, of the land descended or devised, and does not merely give the preference to an existing liability. The words in the section, "the estate of a guardian, or curator, appointed under this act, shall be liable, &c.," although the comma in the printed code, is placed after the word "curator," must be read as if it was placed after the word "guardian," so as to bind the lands of all guardians, and not merely "guardians appointed under this act," or statutory guardians. Thus, the debt due to the ward of a testamentary guardian who was not required to give bond, would as effectually bind his lands in the hands of the heir, or devisee, under this construction of the act, as of a statutory guardian who had given a bond binding his heirs.

[See Ewing v. Burnet, 11 Pet. (36 U. S.) 54; U. S. v. Three Railroad Cars, Case No. 16,-513; U. S. v. Voorhees, 9 Fed. 144; Hammock v. Farmers' Loan & Trust Co., 105 U. S. 83.]

5. The testator J. L., having, by his will, subjected his whole estate to the payment of his debts, (which was a valid devise, sanctioned both by the principles of equity, and the act for the relief of creditors, against fraudulent devises,) and empowered his executors, or such of them as might act, to sell his lands, and convey to the purchaser; has converted his whole real estate into equitable assets, subject to the payment of all his debts equally.

6. The 12th section of the act concerning guardians, &c., before cited, having declared that "the estate of a guardian, or curator, &c., shall, &c., be liable for whatever may be due from him or her, on account of his or her guardianship, &c., before any other debt, &c.," although it gives priority, and creates liability, if it did not before exist, can apply only to real estate, in a condition to be reached by other debts. The language of the section is comparative, comparing the charge it creates with other charges, and giving it the priority over them. Before the passage of the act against fraudulent devises, lands devised, were not liable for any debt whatever, and that statute expressly protects devises for the payment of debts, and declares them valid: it protects the trust, and leaves the estate to its operation. The act of assembly applies to legal, and not to equitable assets. Wherever real estate is made equitable assets by the will, the equitable principle must prevail, and the executor of the ward is only entitled, therefore, to his equal proportion of the fund arising from the real estate of J. L.

In equity. A statement of the facts, and of the statute of Virginia, essential to the elucidation of the various points discussed and settled in the following opinion, is embodied in the above caption. On the 30th of June, 1828, the chief justice delivered his opinion as follows:

MARSHALL, Circuit Justice. This is an application on the part of John Forbes, ex-ecutor of William L. Myers, for an order that he shall receive the amount of his claim, which has been established by a decree of the court of chancery of the state, out of the proceeds of the real estate of John Lesslie, deceased, which are now in the possession of this court for distribution among his creditors.

William L. Myers was a ward of John Lesslie, and priority is claimed for him over all other creditors out of the real estate of his guardian. This priority is claimed under the 12th section of the act "to reduce into one, the several acts concerning guardians, orphans, curators, infants, masters, and apprentices," which is in these words: "The estate of a guardian or curator, appointed under this act, not under a specific lien, shall, after the death of such guardian or curator, be liable for whatever may be due from him or her, on account of his or her guardianship, to his or her wards, before any other debt due from him or her." [2] This clause has been, in the argument, considered in connexion with the 60th section of the "act reducing into one, the several acts concerning wills, the distribution of intestate's estates, and the duty of executors and administrators," which was passed at the same session. That section is in these words: "The executors and administrators of a guardian, or of a committee, or of any other person who shall have been chargeable with, or accountable for the estate of a ward, an idiot, or a lunatic, or the estate of a dead person, committed to their testator or intestate, by a court of record, shall pay so much as shall be due from their testator or intestate to the ward, idiot, or lunatic, or to the legatees, or persons entitled to distribution, before any proper debt of their testator or intestate." [3] It has been truly said, that these two acts, having been passed at the same session, respecting the dignity of claims on the estates of deceased persons, ought to be considered together, and that the two sections ought to be construed as if they were contained in the same act. It has been added, not, I think, with the same correctness, that the one ought to restrain and limit the extent of the other. I have to regret, that these two sections, which are certainly very interesting to the people of Virginia, have not received a settled construction in the state courts, and that this court should be required to hazard an opinion on any point which may not heretofore have arisen in them. It is, however, my duty to state my view of the subject, which I shall be ready to correct, if a different view of it shall be taken in the state courts. In doing this, I shall first consider the 60th section of the act concerning wills, &c., as if it stood alone. The

_____
[2] See 1 Rev. Code Va. 1819, c. 108, § 12, p. 408, passed Feb. 18, 1819.

[3] See 1 Rev. Code Va. 1819, c. 104, § 60, p. 389, passed March 3, 1819.

words of that section are applicable exclusively to the conduct of executors or administrators, in disbursing the assets of their testator or intestate, which come to their hands in their official character. The language of the section will admit of no other interpretation. It applies to no other part of the decedent's estate, and regulates the conduct of no other person. The section is addressed to executors and administrators, and prescribes their duty in the case it describes. That case is the existence of a debt due from their testator or intestate, to the estate of a lunatic or of any deceased person, which may have been committed to his charge. These claims have priority to any proper debt of their testator or intestate, and must be paid by such executor or administrator, out of the assets which may come to his hands. I think it cannot be doubted, that as between themselves, these debts have equal dignity.

The language of the 12th section of the act, concerning guardians, &c. is entirely different. It does not address itself to the personal representatives of the deceased, nor prescribe their duty; nor does it comprehend all the persons who are described in the 60th section of the act concerning wills, &c. It affects the estate of the deceased, not under a specific lien, and provides for the single claim of a ward, on the estate of his curator or guardian. The language of this section reaches the real estate, and must have been so intended. It provides that such estate, not being under any specific lien, shall be liable for such debt, before any other debt due from him or her. A question might arise, whether this section gave priority to a ward on the personal estate over other persons enumerated with him, in the 60th section of the act concerning wills, &c. If it did give such priority, the two acts would be inconsistent with each other. The one would give the ward a preference over persons, whom the other, in express words, placed on an equal footing with him. The rule which requires that acts in pari materia should be construed together, requires that the persons enumerated in the 60th section of the act concerning wills, &c. should stand equal in their claims on the personal estate, and that the 12th section of the act concerning guardians, &c. should apply only to real estate. The same rule, however, requires that it should apply to real estate.

In making this application, I cannot doubt, that the debt due to the ward, is to be preferred to any bond debt due from the testator or intestate on his own account. The language of the act is imperative and explicit. It has been said, that heirs commit no devastavits. From this it is inferred, that one claim can have no priority over another. I shall not examine this proposition. If its truth be admitted, the inference is not of course. In England, all bond debts binding the heir, unless it be the debt to the king, are equal. In Virginia, they are not

equal. A debt due to the ward has a prior claim on the estate of his guardian, to any other debt due to a proper creditor of the guardian. And though I will not say that the heir or devisee may, or may not, commit a devastavit, that he may or may not plead, a debt due to a ward, to an action, I think it may be said, that where both claims come before a court administering legal assets, that which the law prefers, is entitled to preference from a tribunal which expounds and applies the law.

A question of more difficulty, is, on the operation which this statute has on the land of the guardian. Does it create a lien? If it does, the land would be bound in the hands of a purchaser. This has never been supposed, and would be an alarming construction. It would, contrary to the general policy of the law, set up a secret lien, which would be a restraint on alienations not imposed by express words, and not required by any necessary construction of the section. Does it, without giving a lien on the land itself, create a liability of the heir or devisee to pay the debt due to the ward, in consideration of the land descended or devised, or does it merely give preference to an existing liability? The language of the section would indicate, that priority alone was in the mind of the legislature. Its object does not seem so much to enable the ward to obtain satisfaction out of the real estate, as to give an existing claim on that estate a preference to other existing claims. The estate shall be liable to it, "before any other debt due from" the guardian. The legislature would seem to have in its mind, debts for which the estate is liable, and to decide on the dignity of those debts. If, according to the existing state of the law, all debts due to wards from the estates of their guardians, which have preference under this section, have a right to claim satisfaction from heirs and devisees, to the extent of the estate descended or devised, the statute may be construed, not as giving the right, but as giving priority to that right. But if the section applies to cases where no antecedent right exists, it would be difficult to resist that construction of the words, which gives the right as well as the priority. The words of the section which describe the estate to which it applies, are "The estate of a guardian or curator, appointed under this act, &c." If the words, "appointed under this act," apply to a guardian as well as a curator, then priority is given to the wards of statutory guardians only, not to the wards of testamentary guardians; and all statutory guardians are required to give bond. If they apply to a curator only, and give equal priority to a debt due to a ward, whether his guardian was created by testament or by a statute, then priority is given in a case where no antecedent right existed. Testamentary guardians are not required to give bond, if the testator has otherwise directed by his will.

At least this appears to me to be the proper construction of the 2d and 5th sections of the act compared with each other. If the words, "The estate of a guardian or curator appointed under this act, shall be liable, &c." be read with a comma, after the word "guardian," the words, "appointed under this act," could apply solely to the curator. But in the printed code, the comma is placed after the word, "curator," so as to connect the guardian with the curator, and apply the subsequent words equally to both. I am, however, aware, that not much stress is to be laid on this circumstance; and that the construction of a sentence in a legislative act does not depend on its pointing. The legislature can scarcely be supposed to have intended to distinguish between remedies for debts from testamentary and statutory guardians, and I am, therefore, disposed to read the act with the comma after the word "guardian." But although the act directs bonds to be given by guardians, it does not prescribe the form of the bond, or that the heir shall be bound in it. The usage undoubtedly is, to bind the heirs, and it is not probable that any court would be inattentive to this circumstance. The legislature may be presumed to have had such a bond in contemplation, and to have legislated on the idea that the heirs were uniformly bound in it. But suppose a court should neglect to take a bond, or should take a bond in which the heirs were not named, would the general provision of the act, that the estate of the guardian shall be bound to satisfy the debt due to his ward, before any proper debt of his own, be defeated by this omission? I should feel much difficulty in answering this question in the affirmative.

The history of the legislative enactments on this subject, has been referred to in the argument. The act of 1705, for the distribution of intestate's estates, &c., subjects the estate of any person who shall die, chargeable with the estate of any person deceased, or with any orphan's estate, to the payment of such debt, in the first instance, in terms which would apply to real as well as personal estate. The same act may be construed to require bond from testamentary guardians, or from those only to whom the orphan's estate may be committed by the court. In the year 1748, a revisal of the laws was made. The act "for the better management and security of orphans and their estates," gives the debt due from the guardian to his ward priority against the personal estate only, and requires bond from those guardians only to whom the estates of orphans have been committed by order of court. As this revisal is understood to have been the work of the ablest lawyers of that day, it is probable that this act contains the received construction of the act of 1705. The laws were again revised in 1779, and the bills prepared by the revisers, were enacted in 1785. The 50th section of the act concerning wills, &c., gives the

same priority against the personal estate which is given by the act of March, 1819. The 1st section of the "act concerning guardians, infants, masters, and apprentices," renders the estate of every guardian liable, in the first instance, for any debt due to his ward on account of his guardianship, but requires no bond from any guardian not appointed by the court. The revisal of 1792, re-enacts the provisions contained in the acts of 1785. In December, 1794, for the first time, an act was passed, requiring a testamentary guardian to give bond, before he exercises any authority over the minor or his estate, unless it is otherwise directed by the testator's will. This act took effect on the 1st day of March, 1795. From the 1st day of January, 1787, then, when the law of 1785 went into operation, until the 1st day of March, 1795, the law gave priority, against the real estate of guardians, to debts not secured by bond. Upon a review of the whole subject, I am inclined to think, contrary to my first impression, that the act of 1819 ought to be construed, as making the estate of a guardian liable to a debt due to his ward on guardianship account, and not as merely giving priority to such debt. I am not sure that this is material to the main question now before the court.

In this case, the guardian had given a bond in which his heirs were bound; and the question is, whether the ward can now assert, in this court, the priority given by the statute and by his bond. The simple contract creditors maintain that he cannot; because, under the will of John Lesslie, the real estate has been converted into equitable assets. The following are the material clauses in the will: "In the first place, I desire that all my just debts may be paid; and for this purpose I subject my whole estate, real and personal. In case it should be necessary for the purpose of paying my debts, to sell any part of my real estate, I give to my executors, after named, the power of so doing," "and authorize my said executors, or such of them as may act, to make conveyances to the purchaser or purchasers." He then gives some legacies which he charges on his whole estate, and adds, "all the rest and residue of my estate after the payment of my debts and legacies, as aforesaid, I give to my two children, Andrew and Jane." The devisees of the residue are his heirs at law.

It is contended on the part of Myers, that he is entitled to preference: 1. As a creditor by bond, in which the heirs are bound. 2. Under the act of assembly.

1. I will first consider the general proposition, that under this will, bond creditors may assert a prior claim upon the real estate. It must be admitted, that specialty creditors have no lien upon the lands. The heir being bound by the contract of his ancestor, is liable to the amount of assets, which he takes by descent from that ancestor, and no farther. The ancestor could devise his lands,

and the devisee not being bound by the contract, held them exonerated from the creditor, or the heir could alien them, and thus also defeat the creditor, because the lands, not being specifically bound, could not be reached, and the heir at the time the writ issued, held nothing by descent. It being thus clearly settled, that the creditor had no lien on the lands of his debtor, even after his decease, and that the heir was liable for the contract of his ancestor, in regard of lands actually held by descent at the time the writ issued, only to the amount of the land so descended, let us apply these principles to the case under consideration. John Lesslie, by his will, subjects his whole estate to the payment of his debts, and empowers his executors, or such of them as may act, to sell his lands and convey to the purchasers. The validity of this devise in a court of equity, has not been questioned. If it be valid, then it would seem in reason to affect the land in the same manner as a disposition of the land itself, limited to the same objects. The actual interest of the heir in the land, is no greater than if it had been devised to be sold, so far as was necessary to pay his debts, and after the payment of debts, to descend. What then does the heir take beneficially by descent, supposing the will to go no farther than this clause? Obviously, nothing more than what remains after payment of debts. This, then, is the amount of the real assets which he holds liable to the contracts of his ancestor. Suppose this devise, instead of being for the payment of debts generally, had been for the payment of a portion to a child, in pursuance of a marriage contract, or of debts due by simple contract; these devises would have been unquestionably valid, and the land would have been subject to them in equity. What then would have descended to the heir? Clearly, so much only as would remain after payment of the charge. It would seem, then, in reason, that to an action at law by a specialty creditor, the heir ought to have been permitted to show in his plea, the land that had descended, and the charge upon that land, and that in such a case, the judgment should be only for the value, after the discharge of the incumbrance. Suppose, in such a case, the heir were to pay off the portion due by marriage settlement, or the simple contract debts charged on the land, as a court of equity would, I think, compel him to do, and a suit were then to be instituted by a specialty creditor, can it be doubted for a moment, that the heir would be allowed to offset these payments against the sum for which he was chargeable, in consideration of the lands descended, if a court of law could take notice of the charge? These seem to me to be corollaries from the propositions, that, before the statute against fraudulent devises, the ancestor might devise his lands, in whole or in part, so as to defeat creditors, and that a charge upon lands, being valid, affects them to the full extent of the charge, and diminishes, pro tanto, the real assets in the hands of the heir. But in England, courts of common law do not take up the subject in this reasonable point of view, because they do not take cognizance of a trust, nor have they ever sustained a suit brought by a simple contract creditor, against an heir to whom lands have descended, charged with the debts of his ancestor; nor have they, so far as I have observed, ever considered such charge, in the decision of any question brought before them, unless the heir has been also executor. When the two characters are united, so that suits at law could be sustained by simple contract creditors, the courts of common law, excluding the trust from their view, have considered the whole as legal assets. This limited view of the subject, is probably to be ascribed to their limited jurisdiction. I have considered the question, as if the real estate had descended to the heirs. But the testator has devised it to them, and the words of the devise rather strengthen the argument. They are:—"All the rest and residue of my estate, after payment of my debts and legacies, aforesaid, I give, devise, and bequeath to my two children, Andrew and Jane, their heirs, executors, and administrators, to be equally divided between them." What is given to them by this will? If the words of the testator are worth anything, he gives only the residue of his estate, after payment of debts and legacies.

I will now advert to the act for the relief of creditors, against fraudulent devises.[4]

---

[4] See 1 Rev. Code Va. 1819, c. 105, p. 391. This act was passed in 1789, and is nearly an exact transcript of the English statute 3 Wm. III. c. 14. The five first sections upon which the chief justice comments, are as follows:

"Section 1. Whereas, it is not reasonable or just, that, by the practice or contrivance of any debtors, their creditors should be defrauded of their just debts, and nevertheless, it hath often so happened, that, where several persons, having by bonds or other specialties bound themselves and their heirs, have afterwards died, seised in fee simple of, and in, messuages, lands, tenements, and hereditaments, or, having power or authority to dispose of, or charge the same by their wills or testaments, have, to the defrauding of such their creditors, by their last wills or testaments, devised the same, or disposed thereof in such manner as such creditors have lost their said debts: For remedying of which, and for the maintenance of just and upright dealing;

"§ 2. Be it enacted, &c., That all wills and testaments, limitations, dispositions or appointments, of, or concerning any messuages, lands, tenements or hereditaments, or of any rent, profit, term or charge out of the same, whereof any person or persons, at the time of his, her, or their decease, shall be seised in fee simple in possession, reversion, or remainder, or have power to dispose of the same by his, her, or their last wills or testaments, shall be deemed and taken (only as against such creditor or creditors as aforesaid, his, her, and their heirs, successors, executors, administrators and assigns, and every of them,) to be fraudulent, and clearly, absolutely, and utterly void, frustrate and of none effect; any pretence, colour, feigned or presumed consideration, or any other matter or

This act recognizes the power of persons indebted by specialties, in which themselves and their heirs are bound, who die seised of lands, "to dispose of, or charge the same, by their wills or testaments," "in such manner as such creditors have lost their debts." To remedy this mischief, the 2d section enacts, "that all wills and testaments, limitations, dispositions, and appointments of, or concerning any messuages," &c., shall be utterly void as to creditors; and the 3d section gives the creditor the same remedy against the heir and devisee, as he would have had against the heir, had the land descended to him. The 4th section provides, that where there shall be "any limitation or appointment, devise or disposition of, or concerning any messuage," &c., "for the raising or payment of any real and just debt or debts," &c., "the same, and every of them shall be in full force." The case comes within the very words of this part of the proviso. The will of Mr. Lesslie is "a devise or disposition of, or concerning lands," "for the raising or payment of just debts." I do not think the subsequent part of the proviso can vary the construction. The 5th section of the act applies exclusively to cases where lands, not charged by the ancestor with his debts, have been sold by the heir. In the case of Freemoult v. Dedire, 1 P. W. MS. 429, the lord chancellor obviously so understood them. This case, then, stands as it stood before the statute was enacted; and that statute has no other influence on the cause, than to furnish an argument in favor of the validity of the charges made in the will, by its recognition of their validity.

I will now consider the question on the English decisions. At law, the books furnish, I believe, no case in which the rights of a simple contract creditor have been taken into view. To actions of debt brought against the heir on the bond of his ancestor, he has generally pleaded, "nothing by descent," and has relied on a will devising lands to him, charged with debts to support his plea. The single inquiry made by the court has been, whether he holds at law, by descent, or by purchase. In Gilpin's Case, Cro. Car. 161, and Brittam v. Charnock, 2 Mod. 286, he was considered as a purchaser; but in Emerson v. Inchbird, 1 Ld. Raym. 728,[5] and Allam v. Heber, 2 Strange, 1270, which last case is also reported in 1 W. Bl. 22, it was decided that he held by descent. If, in a court of law, which has no jurisdiction over trusts, this issue had been found in favor of the heir, the creditor would have been without remedy. A will, charging his debt on land devised to their heir, would, before the statute against fraudulent devises, have been construed to be a will depriving him of all recourse against the fund.

In cases, where the characters of heir and executor were combined in the same person, the construction by the courts of law, that the whole fund was to be considered as constituting legal assets, seems also to result from the incompetency of those courts to act upon trusts. Common law can reach the case but partially; and its decisions, therefore, ought not to bind a court conclusively, which is so constituted as to enter into the whole subject, investigate it thoroughly, and decide upon it in all its relations. For a time the court of chancery seems to have followed the rule of law; but it is matter of surprise, that any hesitation should ever have been made by that court, in considering the heir as a trustee, and compelling him to execute the trust according to the principles of equity. In Hargrave v. Tindal, reported in a note (1 Brown, Ch. 136), Lord Hardwicke held an estate which descended to an infant heir, charged with debts by the will of his ancestor, to be equitable assets; and the case is still stronger if the estate be devised to the heir so charged. The principle is well settled in chancery, where lands descend,

---

thing to the contrary notwithstanding.   3 & 4 W. & M. c. 14, § 2.

"§ 3. And, for the means that such creditors may be enabled to recover their said debts, be it further enacted, that, in the cases before-mentioned, every such creditor, shall and may, have and maintain, his, her, and their action and actions of debt, upon his, her, and their said bonds and specialties, against the heir and heirs at law of such obligor or obligors, and such devisee or devisees, jointly, by virtue of this act; and such devisee or devisees, shall be liable and chargeable for a false plea by him or them pleaded, in the same manner as any heir should have been for any false plea by him pleaded, or for not confessing the lands or tenements to him descended.   Id. § 3.

"§ 4. Where there hath been, or shall be any limitation or appointment, devise or disposition of, or concerning any messuages, lands, tenements or hereditaments, for the raising or payment of any real and just debt or debts, or any portion or portions, sum or sums of money, for any child or children of any person, other than the heir at law, according to, or in pursuance of any marriage contract or agreement in writing, bona fide made before such marriage, the same, and every of them shall be in full force; and the same messuages, lands, tenements and hereditaments, shall, and may be holden and enjoyed by every such person or persons, his, her, and their heirs, executors, administrators and assigns, for whom the said limitation, appointment, devise or disposition was made, and by his, her, and their trustee or trustees, his, her, and their heirs, executors, administrators, and assigns, for such estate or interest as shall be so limited or appointed, devised or disposed, until such debt or debts, portion or portions, shall be raised, paid and satisfied; any thing in this act contained to the contrary notwithstanding. Id. § 4.

"§ 5. And whereas, several persons, being heirs at law, to avoid the payment of such just debts, as, in regard to the lands, tenements and hereditaments, descending to them, they have by law been liable to pay, have sold, aliened, or made over such lands, tenements or hereditaments, before any process was or could be issued out against them."

---

[5] An heir shall take by purchase under a devise altering the limitation of the estate, but under a devise charging the estate only, by descent.

or are devised to an heir, who is simply heir, subject to the payment of debts. The question was longer unsettled, where the will gave a power to executors to sell. The law uniformly considered the estate as legal assets, where the executors were the trustees. Equity followed the law in this respect, even where the land was devised to the executors to be sold. But in Lewin v. Okeley, 2 Atk. 50, Lord Camden decided that, in such a case, the assets were equitable, not legal. A distinction, not very well founded in reason, was taken between a power given to executors to sell, and a devise of the lands to be sold by executors. The descent was considered as broken in one case, not in the other. This distinction derives countenance from the great authority of Lord Coke; but is, I think, assailed in the notes of Hargrave and Butler, with arguments not easily to be refuted. However this may be at law, it is, I think, completely overruled in chancery. This whole subject is fully considered in the case of Silk v. Prime, reported in a note 1 Brown, Ch. 138. The testator charged all his real estate, except a part devised to his mother, with his debts, and directed that Prime and Maxon, who were his executors, or the survivor of them, or his heirs, should sell so much of it as might be necessary for their payment. In this case, the land was devised to his wife and two daughters, which two daughters were his heirs; and the words of the will give a naked power to the executors, and the heirs of the survivors to sell. The chancellor, after great deliberation, and a thorough examination of the cases, determined that the lands were equitable assets. In giving his opinion, he enters into a full investigation of the subject, in which he says that he can hardly suggest a case in which the assets would be legal, but where the executor has a naked power to sell qua executor. It was held that the naked power was not qua executor in that case, because the power might be executed by the heirs of the survivor, in whose hands the produce of the sales could not be assets, nor could the creditor maintain an action at law against him. As Mr. Lesslie has not given the power to the heirs of the executor, it may be supposed that the decision in Silk v. Prime is inapplicable to the case before the court; and is rather an authority in favour of treating the assets as legal. This makes it proper to proceed somewhat farther with Silk v. Prime. The chancellor obtains two rules from the dissertation he had concluded. 1. It is a good rule in expounding wills, to make them speak in favour of equitable assets, if it can be done. 2. If you can lodge the assets in the hands of the trustees, the court will never put them in the hands of the executors; and when a person is invested with both characters, the trustee shall be preferred. In applying these rules to the particular case, the chancellor undoubtedly rests much on the extension of the power to

the heir of the executor, but he does not rest on this principle solely. He relies also on other parts of the will, which I think would have been deemed sufficient, had the power to sell not been extended to the heirs of the surviving executor. His language in this part of his opinion is impressive. 1. It is, "The testator's will does most emphatically direct the payment of all his just debts." "I can never think that a man who does repeatedly and so anxiously provide for the payment of all, could ever mean, 'by legal preference, to pay some and leave the rest unpaid." 2. The second relates to the extension of the power to the heir of the surviving executor. 3. "This is the case of a charge upon the lands. They are devised to the testator's wife and daughters, subject to this charge. In this respect it is a trust, and no more to be sold, than what is necessary for this purpose. The power, then, to sell, is merely consequential; the testator having named the executor for this purpose. The court would have compelled the devisees. Whoever sells to satisfy a charge must be a trustee—because a charge is a trust. To make this case still clearer: the rents and profits in the hands of the devisees are assets before the sale; legal assets they cannot be, for the executor has no right to receive them. They must, therefore, be equitable assets: and if it be once admitted that any one part of the land is equitable assets, the whole must be the same, for the trust is one and the same trust throughout." These reasons exist in all their force in the case under consideration. No testator could display more anxiety for the payment of all his debts, than is displayed by Mr. Lesslie. This, too, is a charge on lands. They are devised to the daughters, subject to this charge. That the devisees are the heirs at law, can make no difference in the question now under the consideration of this court, or which was under the consideration of the English court. That question was not and is not, whether the descent is broken by the devise, but whether the naked power to the executors to sell, converted the estate into legal assets. That question is the same in this court as in that, and the language of the chancellor is as applicable, as if a third person had been a devisee with the two daughters. In this, therefore, the charge is also a trust, and no more of the land is to be sold than is necessary for the purpose. In this case, too, the court would compel the devisees to sell; and the power, therefore, to sell, "is merely consequential; the testator having named the executors for this purpose." The devisees would have sold under the order of the court as trustees. In this case, too, had the heirs received the rents and profits before the sale, they would have been equitable assets, subject to the trust. I cannot read this part of the opinion without being convinced, that the chancellor would have decreed the assets to be equitable, although

the heir of the executor had not been named. In the case of Newton v. Bennet, 1 Brown, Ch. 135, the testator, after making provision for his wife, desired, "that all his estates in Kent should be sold forthwith, and, (after payment of several sums of money,) that the remainder might be vested in his executors for the payment of his debts." Lord Bathurst decided that these were equitable assets. Upon a re-hearing, by consent, Lord Thurlow (pages 137, 138) expressed the same opinion. He said, "the devise was tantamount to giving the executor a power to sell, and to apply the money to the payment of debts." In noticing the argument at the bar, that the descent was not broken, he adverts, certainly not with approbation, to the distinction taken by Lord Coke, between a devise of land to be sold by his executor and a dry power to sell. He concludes with saying: "I think the descent is broken, and that these are equitable assets," &c.

It has been contended, that this case turned entirely on the question, whether the descent was broken, and is an authority in favour of equitable assets in no case, unless the descent be broken. This argument is founded on the following words, which the reporter has ascribed to Lord Thurlow: "I think the descent is broken, and that these are equitable assets on the authority of Sir Joseph Jekyl. 3 P. Wms. 341." The proof that these words were not uttered by Lord Thurlow, is very strong. In two cases, mentioned in a note to the report, the mistake is stated on evidence which appears to be conclusive. The opinion itself, seems to me to prove that Lord Thurlow could not have put the case on this point; if, as he says, "the devise was tantamount to giving the executor a power to sell, then the descent could not be broken, according to the construction put on such devises. by those who contend for legal assets." The reference to the case in 3 P. Wms. 341, in the very sentence in which this declaration is said to be made, and following that declaration as if furnishing the authority for making it, is also of some weight, because that case turns on a different question. Lord Thurlow also says: "The only matter urged, was, that where money, to be raised by the sale of lands, was given to executors, it was made personal, and must be applied in a course of administration;" "but that doctrine has not been adopted in later times, and must imply that a testator meant differently in giving to an executor, than if he had given to any other trustee." But if the will is properly stated in the report, these words, giving them the full effect claimed for them, would make no difference in the effect of that case on the present. If, in the will of Thomas Tryon, as stated in Newton v. Bennet, the descent was broken, then it is broken in this case also, and in every case where a power is given to sell. The case of Pope v. Gwyn, mentioned in 8 Ves. 28, was on a will in which

the testator directs, that his real and personal estate should be liable for all his debts of what sort soever. Lord Thurlow held the real estate to be equitable assets. These cases were decided before the passage of the act establishing the judiciary of the United States, which adopts the principles of chancery, as the rule in cases of equity in the federal courts. In Bailey v. Ekins, 7 Ves. 319, William Garrett charged his real and personal estate with the payment of his debts, and devised his lands to his executors, their heirs, &c., in trust to sell and pay his debts, and apply the residue to the support and education of his heir, until he should attain his age of twenty-one, when he gave the money and real estate to his heir. It was contended, that the descent was not broken, and that a charge did not make the estate equitable assets. In this case, the devise is to the executors and their heirs, but this circumstance is not relied on or mentioned in the argument of counsel, or in the opinion of the court. The chancellor did not decide the question, whether the descent was broken. He said, "That Hargrave v. Tindal, and Burt v. Thomas, and Batson v. Lindegreen [2 Brown, Ch. 94]. were authorities, that a charge upon real estate does make it equitable assets." He said, "the rule cannot be accurate, when it is stated that the descent ought to be broken. Suppose a devise to trustees, in trust to pay debts; and all the trustees dying in the life of the testator, the estate descends upon the heir, would not that be equitable assets?" He says again, "a mere charge is no legal interest. It is not a devise to any one, but that declaration of intention upon which a court of equity will fasten, and by virtue of which they will draw out of the mass going to the heir, or to others, that quantum of interest which will be sufficient for the debts." In Shiphard v. Lutwidge, 8 Ves. 26, Henry Lutwidge devised his estate to his heir, charged with the payment of his debts. The chancellor determined that the heir was a trustee, and that the estate was equitable assets.

This question, where the estate passes to the heir, or where the power to sell is given to the executor and his heirs, appears to be completely settled in England.[6] The only doubt, if there be a doubt, is where a naked power to sell is given to the executors, without mentioning their heirs. I think the case of Silk v. Prime, together with the subsequent cases, decides that under such a will, the assets are equitable. In Nimmo's Ex'r

---

[6] So said Kent, chancellor, in Benson v. Le Roy, 4 Johns. Ch. 651. That was a devise of all the testator's estate, real and personal, to four trustees, (three of whom were executors,) in fee, in trust, to pay his debts, and then to distribute the residue. "Such a devise, in trust, places the assets under the jurisdiction of this court. A court of law, does not take cognizance of a trust; but the notice of it belongs, peculiarly and exclusively to this court."

v. Com.,[7] 4 Hen. & M. 57, the testator had directed his lands to be sold for the payment of debts. I have searched the record, but the will is not in it. The judges all speak of it as a charge, and it is to be presumed that the sale was made by the executor, because the price of the lands is introduced into his account. The judges all say, that it is equitable assets, and that the judgment of the commonwealth gave no priority: that those assets should be pursued in chancery.

I proceed now to consider the operation of the act of assembly on this case. It declares that the estate of a guardian or curator, shall, after his death, be liable for whatever is due to his ward on account of his guardianship, before any other debt due from him or her. It has been already said, that this section gives priority, and creates liability if it did not before exist, but does

---

[7] "Before the statute of 3 W. & M.," viz: the statute against fraudulent devises, "if the testator devised his lands for the payment of his debts, all the creditors were to be paid pari passu, or in ratable proportions, for it was to be presumed, that the testator meant to do equal justice to all." "The statute of W. and M., did not interfere with this doctrine of equitable assets, but rather gave it, as it has been said, a parliamentary sanction. That statute was made for a relief of creditors against fraudulent devises; and so the preamble to it, as well as its title, expressly declares. It does not apply to the case of a devise to trustees, for the payment of debts, for such a devise is in furtherance of justice, and of the avowed policy and purpose of the statute. To mark that policy the more distinctly, the 4th section of the statute, expressly excepted from its operation, devises of lands for the payment of debts, or children's portions. The omission of this proviso in our statute," (retained in the Virgina statute, see ante, p. 512,) "cannot make the least alteration in its construction. It must have been omitted, because it was unnecessary, and was doubtless inserted in the English statute, for greater caution." In reviewing the English cases cited above, by Chief Justice Marshall, Chancellor Kent, says:—"In Newton v. Bennet, Lord Thurlow referred to the former case, and said, that an estate devised to an executor to sell, was equitable assets: and from some correct notes of this case, 7 Ves. 321, 322; 8 Ves. 30, it appears that he did not consider it to be requisite that the descent should even be broken by the devise, to render the assets equitable. It has since been repeatedly held, Bailey v. Ekins, 7 Ves. 319, Shiphard v. Ludwige, 8 Ves. 26, that a mere charge of the debts upon the real estate by will, makes it equitable assets, even though the descent be not broken. It is sufficient that the estate be devised upon trust to pay debts; and a charge of the debts upon the real estate, is, in substance and effect, a devise, pro tanto. This was the doctrine of Lord Eldon, in those cases; and he made this clear and pertinent observation, that a provision by will, effectual in law or equity, for payment of creditors, was not a fraudulent devise within the statute. And I may add, that such a devise is equally valid and innocent, and commendable withal, as it would be under the protection of the proviso in the English statute."

The case of Benson v. Le Roy, however, the chancellor said, steered clear of every difficulty, because in that case, the descent was broken, there being a devise in fee and to a stranger, as well as to the executors. See, also, Clay v. Willis, 1 Barn. & C. 364, 8 E. C. L. 103.

---

not create a lien. The words imply a liability for other debts. One estate cannot be properly said to be liable for one debt before others, if it be not liable for others. Although, then, the section may charge lands with a debt with which they were not previously chargeable, it does not follow that it charges land in a condition not to be charged by existing law. The language of the section is comparative. It compares the charge it creates, if it does create one, with other charges, and gives it the priority over them. This can apply only to an estate, in a condition to be reached by some other debts. Previous to the passage of the act against fraudulent devises, lands devised were not liable for any debt whatever. Lands devised for the payment of debts, being exempted from the operation of that statute, pass as they did before it was enacted, and still remain exempt from all legal liabilities. By this exemption, the statute protects the trust, and leaves the estate to its operation. I felt much difficulty in deciding, whether the words of the section do not apply to equitable as well as legal assets. But legislation is rarely intended to act upon, and control the equitable principles which are applied by a court of chancery, unless its language be such as to leave no doubt of the intended application. Even after forming an opinion on this point, I felt a pressure of the question, whether a case in which the lands were to be sold under a power given to the executor, did not constitute an exception applicable to this case. After bestowing the best consideration in my power on the English cases, I have come to the conclusion, that wherever the assets are equitable, the equitable principle must prevail. That the right of the ward to priority, where the assets are equitable, has never been asserted in this country, is not without its weight in the consideration of this case. In the case of Jones v. Hobson, 2 Rand. [Va.] 483, the court of appeals determined, after an elaborate argument, as I have understood, and a profound consideration of the subject, that the sureties of an executor were not bound for money which came to his hands, on account of lands sold for the payment of debts. In delivering the opinion of the court, Judge Green, in commenting on the act which provides that the bond may be put in suit until the will "be fulfilled," "as far as lies in the executors to fulfil the same," says: "This expression is understood to relate to the fulfilment of so much of the will, as it belongs to the executors in their character of executors merely to fulfil, and not to any superadded duty imposed upon them by the will, as trustees or otherwise." Page 497. Again, he says: "At the common law, in whatever order the executor might be bound at law or in equity, to apply the proceeds of land to the payment of debts, he acted in relation to that subject only as trustee. It was a trust

superadded to the office of executor, and not inseparable from it." Page 498. He concludes so much of this very able opinion, as relates to this subject, with saying: "Upon this point we are of opinion, that the proceeds of land devised to be sold are not, and never were, a testamentary subject; that executors held such proceeds, not in their character of executors, but as trustees; that the literal terms of the executor's oath and bond, bind him only in relation to the goods, chattels and credits, of his testator; that there is nothing in our legislation on this subject, which indicates an intention that the obligation should have a greater extent, but the contrary; and that the sureties of an executor, are not responsible for the proceeds of land sold by him." Pages 501, 502. This opinion was given in a case in which the will of the testator in all its material features, resembled that of John Lesslie. It decides positively, that in such a case, the court of appeals considers the executor as holding the money, arising from land sold by the executor under a power given by the will, as a trustee; and, consequently, that they are equitable assets.

The conclusion to which I am brought by a consideration of the cases in England and in this country, is, that the executor of Myers, is entitled, only to his equal proportion of the fund arising from the real estate.[3]

---

[3] Since the opinion given above was delivered, several cases have been decided by the court of appeals of Virginia, involving the question, how far certain devises should be considered as creating a charge upon the testator's real estate, and converting it into equitable assets? which it is proper to notice here.

In Downman v. Rust, 6 Rand. [Va.] 587, decided in December, 1828, the contest was between the legatees and devisees. The testatrix bequeathed two several legacies, and in the event of the legatees, (or either of them,) dying before the executor could pay the legacies, she directed the legacies to be equally divided among the heirs of the legatees respectively. The testatrix then devised all the rest of her estate, real and personal, in fee simple, to her brother, whom she appointed executor. It was in proof, that the testatrix lived for many years in the family of one of the legatees, (who was the mother of the other legatee,) on terms of the utmost intimacy and affection, and that the devisee was her heir at law; that the personal estate of the testatrix, at the date of the will, and at the death of the testatrix, about a month afterwards, was very inconsiderable: that, at each of these periods, she was seised of a valuable tract of land, on which her brother entered as devisee; that the devisee conveyed the land in trust, under which it was sold, and that the purchaser had notice of the claim of the legatees. It did not appear that the testatrix left any debts. The opinion of the court was delivered by Carr, J., who said:—"Every question of a charge on lands under a will, is a question of intention. In the case of debts, it is so natural to suppose that a man in that solemn act, intended to be just, that courts have taken very slight words in a will, to imply a charge upon lands. The books

Decree.—The decree rendered in this cause, directs the commissioners, R. Stanard and Samuel Taylor, to disburse the fund in their hands ratably, among all the creditors of John Lesslie, deceased, paying to John Forbes, executor of William L. Myers, deceased, the sum of $2340.46, that being the dividend to which he was entitled on his claim, in part payment of the decree rendered in the chancery court of the state, in favour of the said Myers, against Lesslie's executor, without prejudice to the said decree.

---

are full of such cases. Trent v. Trent, Gilmer, 174, is one of that class. Legacies do not stand on quite so high ground, being voluntary gifts; but yet, every man is supposed to intend that they shall be paid, and to have settled in his mind, the fund for their payment; and if there be no fund but land, or if there be expressions tending to show that the testator had the land in his mind, the court will turn them upon the land, rather than they should go unpaid." Held: 1. That the will created a charge upon the land, for the payment of the legacies. 2. That this charge followed the land into the hands of the purchaser, with notice, not, indeed, upon the ground of fraud, but upon the principle of caveat emptor. In this case, it may be remarked, that the will was held to create a charge upon land: 1. by implication; 2. in favour of legatees; 3. that the charge adhered to the land in the hands of a purchaser, with notice.

"I appoint A. B. my sole executor; no security to be required of him, without so much as will justify all my just debts. The residue I confide in him, to dispose of as I shall hereafter direct. I wish him to dispose of all my real estate, except, &c." In a subsequent clause, the testator bequeathed a legacy, "as soon as it can (could) be made after my (his) just debts are (were) paid." Per Curiam. We are of opinion, that the will subjected the real estate to the payment of the testator's debts. Dunn v. Amey, 1 Leigh, 465.

"It is my will and desire, that all my just debts be paid. After that, I wish that A. B., have $1000, provided my estate will admit of it." The testator had real estate, which, not being disposed of by the will, descended to the heir at law. The heir at law, qualified as administrator, with the will annexed. Nearly the whole of the personal estate, which did not amount to $1000, was absorbed by debts. The legatee filed her bill against the heir at law, praying to charge the legacy on the testator's lands, descended to him. To this bill, the heir demurred, and thus presented the question: whether the legacy could in any manner, be charged on the real estate descended?

Per Curiam. 1. By the will, the real estate was charged with the payment of all the testator's debts. Trent v. Trent's Ex'x, Gilmer, 174. 2. The legacy was a direct and absolute charge upon his real estate, not, indeed, by the express terms of the will, but by strong and necessary implication. Clarke v. Buck, 1 Leigh, 487.

In Kenney's Ex'rs v. Harvey, 2 Leigh, 70, the testator charged his real estate with the payment of his debts, and, subject to debts, devised it to his wife, part in fee, and part for life, with remainder over. The court said that, the will constituted the real estate an equitable fund, out of which, all the creditors were entitled to satisfaction, pari passu.