THE TOWN OF OTTAWA, plaintiff in error, *vs.* THE COUNTY OF LA SALLE, defendant in error.

*Error to La Salle.*

The annual meeting of the board of supervisors, under the law authorizing township organization, is in November. And the board may elect a temporary chairman, whether there is a regular chairman in existence or not.

Any meeting of the board of supervisors, at which a quorum is present, must be regarded as valid.

That portion of the law which confers jurisdiction over the county affairs upon the board of supervisors, went into operation on the first Tuesday in April, 1850.

The county corporation was not abolished by this law. Its name was changed, but suits instituted in the old name, do not therefore abate.

The question presented for the consideration of the Court by the parties was as to the abatement of the suit. The points raised and discussed are fully presented by the opinion of the Court.

A. HOES and H. G. COTTON, for plaintiff in error.

E. S. LELAND and W. H. L. WALLACE, for defendant in error.

Opinion by Mr. Justice CATON:

This suit was brought by the county against the town, previous to the adoption of the township organization law, in Novem-

ber last, and the cause was tried and judgment rendered in favor of the county, since the first Tuesday in April last. It is now objected, for the plaintiff in error, that the old political corporation of the county of La Salle was abolished by the adoption of the township law, and a new political body was created, by the name of the board of supervisors of the county of La Salle, and that hence the suit abated, upon the adoption of that law. We agree with the counsel for the defendant in error, that the annual meeting of the board of supervisors does not take place till November. The time of that meeting is made to depend upon the time of the general election. The first section of the sixteenth article of the law provides, that the board of supervisors " shall meet annually in their respective counties, for the despatch of business ; " and the next section declares, that " the annual meetings of the board of supervisors shall be held on the first Monday after the general election," &c. By determining the time of the general election, we fix the time of the annual meeting of the board. The ninth section of the sixth article of the constitution says, " the general elections shall be held on the Tuesday next after the first Monday of November, biennially, until otherwise provided by law." The Legislature has not attempted to change the times of the elections, but, by an irresistible implication, they have changed the general elections from biennial to annual, so that all of the regular November election are considered general elections. Requiring annual meetings of the board, which are to be held immediately succeeding the general elections, implies that there shall be annual general elections. Unless the general elections occur annually, the law could not have been adopted so as to go into operation at the time prescribed by the Legislature. The first section of the law provides, that the qualified voters of each county may vote for or against organization under the law, at the next general election after its passage ; and the fourth section declares, that it shall go into operation on the first Tuesday in April, 1850, in the counties in which it shall be adopted. The first general election held under the new constitution, was in November, 1848, and the law was passed in February, 1849. Between that time and April, 1850, the law was authorized to be voted for, at a general election, while, according to the provisions of the constitution, no general election would occur till November, 1850.

Now, unless it shall be held that the Legislature has provided for the occurrence of general elections oftener than is prescribed by the constitution, then we must say that the time has not yet arrived at which the voters could express an opinion for or against the law, for that could only be done at a general election. Requiring the people to vote at a general election, between February, 1849, and April, 1850, is, in effect, providing that a general election shall occur during that period; and as the only election which was provided for, during that time, was to take place in November, 1849, that, of course, was the general election contemplated by the law. Indeed, the second section of the election law, which was approved on the same day with the law under consideration, may be fairly construed to provide for annual general elections, for that declares, in substance, that all state and county officers shall be elected at general elections, on the Tuesdays next after the first Mondays in November, whether they are elected quadrennially, biennially or annually. We hold, then, that the Legislature has, in the exercise of the authority conferred by the constitution, provided for annual general elections; and that, as the law now stands, at least, for all the purposes of this act, the annual November elections are general elections, and, hence, that the annual meetings of the board of supervisors must be held on the Mondays succeeding those elections. It was suggested that it might have been the intention of the Legislature that the annual meeting of the board of supervisors should be held on the Mondays succeeding the April elections provided for by the act, instead of the November elections. This, however, cannot be, for, by the first and fourth sections of article nineteen, the assessments are to be made between May and August; and by the first, sixth and seventh sections of the twentieth article, the assessment rolls are to be examined and corrected by the board of supervisors, at their annual meeting, and a warrant issued for the collection of the taxes by the fifteenth of December.

Admitting that the annual meeting of the board of supervisors cannot take place till after the November election, it was argued that, as a board, they cannot act till that time, because there is no provision of law authorizing them to organize until their annual meeting. As we have before seen, that the first section of the sixteenth article requires the board to hold annual meetings,

and that it further provides, that, "as a board of supervisors, they may also hold special meetings, at such times and places as they may find convenient, and shall have power to adjourn from time to time, as they may deem necessary." The third section says, "the board of supervisors of each county in this state shall have power, at their annual meetings, or at any special meetings," to exercise the jurisdiction in that section conferred, and "to perform all other duties which may be enjoined on them by any law of this state," &c. The sixth section declares, that "they shall, at each annual meeting, choose one of their number as chairman, who shall preside at such meeting, and in all other meetings held during the year. In case of his absence, at any meeting, the members present shall choose one of their number as a temporary chairman." From this it is argued, that the board cannot hold and organize a special meeting until it is organized at an annual meeting, and that its jurisdiction cannot attach until it can organize and exercise it. That the board can only organize by the election of a chairman, may be conceded, but the argument which is drawn from the peculiar language of this section, that the board can only choose a temporary chairman after a regular chairman has been chosen, proves too much. The extent of that argument is, that as the board can only choose a temporary chairman in the absence of the regular chairman, there must be a regular chairman in existence, who may be absent, and whose place may be temporarily supplied, or else the supervisors cannot select one of their number to preside over them temporarily. Under that construction of the law, if the chairman elected at the annual meeting should die immediately after the adjournment, then no other meeting could be held during the year, for there would be no regular chairman in existence, who could be absent. An absent regular chairman being necessary to authorize them to choose a temporary one, no such choice could be made, for the want of that contingency. Indeed, by giving the law this construction, we should hold that the board will always be in a state of disorganization, and incapable of organizing or acting, between April and November, in every year, for the chairman who is elected in November goes out of office in April, and there is no more authority for electing a temporary chairman between April and November, 1851, or any subsequent year, than there is during the same period in

1850. So long as the Legislature has given the board power to "hold special meetings, at such times and places as they may find convenient," we do not think that it was intended that they should be incapable of doing so for seven months in each year. The mode of calling a special meeting is not specified in the act, and hence there is no means of testing the legality of the call, and any meeting of the board, at which a quorum is present, must be regarded as valid. Special meetings cannot be regarded as those which are held by adjournment from the annual meetings of the board, for adjourned and special meetings are both spoken of and recognized in the sixth section of the ninth article.

One of the most important provisions of this law is, that which confides the management of the county affairs to the board of supervisors, instead of the County Court. And the fourth section of the first article provides, that the county voting in favor of the adoption of the law "shall be governed by and subject to the provisions of this act, on and after the first Tuesday in April, 1850." This strong expression manifests an intention on the part of the Legislature, that the entire act, so far as it relates to the government of the county, should go into complete operation at that time. It is true, that an express provision, in another part of the act, postponing the operation of any portion of the law, would have the effect to defer it, but a mere failure to provide specifically for the immediate organization of the board ought not to have that effect. We are very clearly of opinion, that that portion of the act which confers jurisdiction over the county affairs upon the board of supervisors went into operation at the time specified in the fourth section of the first article ; and, even if express authority had not been given to the board to hold special meetings, that authority would have been implied, if special meetings should be found necessary, in order to carry out the provisions of the law.

But did the suit necessarily abate, upon the adoption of this new law ? We think not. The old political corporation, known as the county of La Salle, was not abolished by the law. The same artificial existence continued after as before. Sufficient of the provisions of the law has already been referred to to show this. The name by which suits should be brought to enforce the rights of or liabilities against the county, was changed, it is true,

but it is only that designation that is changed, and not the corporation itself. Formerly suits by or against a county were required to be brought in the name of the county commissioners of the county. That was changed by a law which required such suits to be brought simply in the name of the county; and now we have another change, which requires them to be brought in the name of the board of supervisors of the county. But during all these changes, the county has remained the same, even in name. There are no words in the act manifesting a design to abolish the old corporation, or to create a new one. Let us look at the consequences of the construction contended for, and consequences may be considered, when seeking to arrive at the intention of the Legislature. If the corporation was abolished, as there is no provision of law conferring its rights and imposing its liabilities upon the new corporation supposed to have been created, those rights are gone, and those liabilities extinguished; and all its real estate would revert to the grantors, because, as the party in whom the title was vested is annihilated, and has no successor, in whom the title can vest, that must necessarily go back through the same channel by which it came, to find a resting place. Hooker *vs.* Utica and Hudson Turnpike Company, 12 Wend., 371; Haywood *et al. vs.* The Mayor, &c. L., N. Y. Legal Observer, 244.

The Legislature certainly never intended to produce such a result, and we ought not to hold that they have done so, where the language of the act will reasonably bear a different construction. Here even the name of the county is not changed, but merely a change of the title in which suits shall be brought, without any change of existence or change of right in the plaintiff in the suit. But if the name of the county had been changed, the suit might still continue. The change of the name of the plaintiff in a suit would not, of itself, abate the suit. Suppose an act were passed changing the name of a natural person, who has a suit pending, would the suit thereby abate? While the party remains the same, the suit may continue. It would be proper, no doubt, to suggest the change upon the record, and to make the title of the cause conform to it; but if this is not done, and the defendant chooses still to go on and answer to the cause, under its former title, he ought not to be allowed to raise the

objection in this Court, when his liability has been established. We are of opinion that the suit did not abate.

As, by the agreement of the parties, the other questions arising upon the record were to be continued for argument until the next term of the Court, the question of costs will be reserved till that time.