## Walter Crane v. Edwin Reeder and Eliza Reeder.

*Escheated lands: Power of disposition: Construction of statutes: Repugnancy: Act No. 151 of 1846.* The act of May 18, 1846, "concerning the estates of intestates escheated to the state," conferred upon the trustees therein named the power of selling and disposing of, in such manner as they shall deem for the best interests of the state, all lands which had then escheated or should thereafter escheat to the state.

There is nothing in *Sub. 9, Sec. 1* (§ *2812, Comp. Laws*), which provides that certain estates shall escheat to the state for the use of the primary school fund, repugnant to the special act of 1846, for it contains no provision applicable to estates which had before escheated, nor any provision for the sale of such as had, or might thereafter escheat. Nor is there anything in the Constitution of 1835, or in the Revised Statutes of 1846, which makes any appropriation of the proceeds of the sale of escheated lands; and, until the adoption of the Constitution of 1850, the only appropriation of the proceeds of escheated lands is

CRANE v. REEDER.

found in the special act of 1846. There is, therefore, no repugnancy between the general revision of 1846 and the special act, which was passed on the same day, but took effect nine months earlier.

Where there are two acts or provisions, one of which is special and particular and certainly includes the matter in question, and the other general, which if standing alone would include the same matter, and thus conflict with the special act or provision, the special act must,be taken as intended to constitute an exception to the general,—especially when such conflicting provisions are contemporaneous in their passage. Accordingly,—as the general powers of the Commissioner of the Land Office (§ 2428, *Comp. Laws*), to lease, sell and dispose of the public lands, can only be exercised in the "manner directed by law," and there being no provision of law for the sale of the escheated lands, except that contained in the special act of 1846, which commits this power to the trustees named in it,—the act of 1846 must be construed as creating an exception to the general act, and therefore the sole power of selling the escheated lands is in the trustees named in the act of 1846.

*Constitution of 1850: Primary school lands.* The lands mentioned in Sec. 2 of Art. 18 of the Constitution of 1850, do not include escheated lands; and Sec. 3, which provides that the interest on the clear proceeds of the sales of escheated lands shall be appropriated exclusively to the support of primary schools, is not so repugnant to the act of 1846, which directs that these proceeds shall be deposited in the Treasury to the credit of the general fund, as to deprive the trustees, named in the act of 1846, of the power to sell the land as therein provided.

*Execution of power of sale.* There is no principle of the common-law, nor is there any statute of this state, which requires trustees, having an express and unqualified power to sell "in such manner as they may deem for the best interest" of the trust committed to them, to sell only by public auction; or first to offer the property by auction.—*Ballou v. O'Brien, 20 Mich., 323.*

*Heard January 7. Decided April 5.*

Error to Wayne Circuit.

This was an action of ejectment, brought by Walter Crane in the Circuit Court for the County of Wayne, against Edwin Reeder and Eliza Reeder, for a tract of land known as private claim No. thirty-nine, containing two hundred and eight acres of land. The defendants pleaded the general issue. The cause was first tried at the November term, 1869, of the Circuit Court; when, under the rulings and charge of the court, judgment was rendered in favor of the defendants; which was reversed in this court upon writ of error, at the July term, 1870 (*21 Mich., 24*), and a new trial ordered. The cause was tried again at the October term, 1870, of the Circuit Court. The plaintiff adduced evidence to prove that one John Harvey died seized of the

premises in controversy, on the fifth of December, 1825; that he left no heirs surviving him except Maria Yorke Harvey, who was his daughter; that Maria Yorke Harvey intermarried with Edwin Reeder in the year 1826, and died in the summer of 1827, leaving no heirs surviving her; that both the said John Harvey and Maria Yorke Harvey were aliens and natives of England, and that neither of them ever became naturalized citizens of the United States. The plaintiff further offered in evidence the original of a certain deed from the State of Michigan to plaintiff, dated April 18, 1868, purporting to have been executed by the grantors as trustees of escheated lands, under the powers conferred by a statute of the State of Michigan, entitled "An act concerning the estates of intestates escheated to this state," approved May 18, 1846 (*1 Comp. L., Sec. 280*). The execution of said deed was proved by one of the subscribing witnesses thereto, and it was admitted by the defendants to embrace the premises in controversy.

To the admission of this deed in evidence the defendants objected on the following grounds:

*First.* That the act of 1846, above named, applies only to escheats accrued to the state since the organization of the state government.

*Second.* That said act only authorizes the trustees therein named to sell and convey lands escheated to the state for want of heirs.

*Third.* That said act does not authorize such trustees to sell and convey any lands as escheated, of which neither the state nor the trustees have ever had possession in any way, or which, being held in actual adverse possession, have never been brought under the actual charge or control of the State, or of said trustees.

*Fourth.* That the act of 1846, aforesaid, was repealed by the operation and effect of Chapter 173 of the Revised Stat-

utes of 1846, on the taking effect of these statutes, March 1, 1847.

*Fifth.* That said act was repealed by the operation and effect of sections 2 and 3 of Art. XIII. of the Constitution of 1850.

*Sixth.* That if the said trustees have power to sell and convey escheated lands, such lands must first be exposed for sale at public auction, and to the highest bidder.

*Seventh.* That the deed of April 18, 1868, made by the trustees to the plaintiff, purports to be a deed by the state, and is not valid as a deed by the state, for want of sufficient execution. It is not valid as a statutory deed of the trustees, because it is not in form their deed.

*Eighth.* That said deed is without any authority of law, and void.

The Circuit Judge held the deed to be inadmissible in evidence and rejected it, to which the plaintiff excepted.

It was admitted that the defendants were in possession of the premises described in said declaration, at the time of the commencement of this suit. No evidence was given on behalf of the defendants in said cause.

The Circuit Judge instructed the jury that no evidence had been given in said cause connecting the plaintiff with the title of the state to the premises in controversy. To which charge the plaintiff excepted. Verdict and judgment having been entered for the defendants, the record now comes into this court by writ of error.

*Samuel T. Douglass, William P. Wells,* and *Geo. E. Hand,* for plaintiff in error.

*D. B. & H. M. Duffield, Geo. V. N. Lothrop,* and *Alex. D. Fraser,* for defendants in error.

CHRISTIANCY, J.

This case comes before us for the second time, having at the last July term been decided upon the questions then presented, and sent back for a new trial, which has been had. The court on the second trial having held the deed from the Auditor General, State Treasurer and Secretary of State, to Crane, void, and refused to receive it in evidence— (on what particular ground the record does not specially show, but, as we are compelled to infer, upon some of the objections urged, which raise the questions we proceed to discuss), the case again comes before us upon bill of exceptions, and writ of error.

The only questions open for discussion, not fully argued before, and embraced in our former decision, are:—

1st. Whether the act of May 18, 1846, "concerning the estates of intestates escheated to this state" (*1 Comp. L., p. 170*), was repealed by the Revised Statutes of the same year, when that revision took effect, March 1, 1847?

2d. If not so repealed, was the same act repealed or rendered so far nugatory, by the Constitution of 1850, as to take away the power of sale therein given? and,

3d. If it was not repealed or affected in either of these modes, but remained in full force, could the trustees or officers, therein referred to, sell these lands at private sale, without having first offered them at public sale, to the highest bidder?

We shall consider the questions in their order.

First, then, was the act in question repealed by the Revised Statutes of 1846 upon their taking effect March 1, 1847?

It is insisted by the counsel for the defendants in error, that this special act was intended to have a temporary effect only, until the revision should take effect.

CRANE *v.* REEDER.

To a proper understanding of this question it will be essential to inquire into the nature of the provisions made by the revision, in relation to escheated lands, and the nature of the provisions of this act in relation to such lands, and how far they cover the same ground, and to what extent they differ.

Both the Revised Statutes, as an entire act, and the special act in question, were passed by the Legislature on the same day, May 16, 1846; and both were approved by the Governor on the same day, May 18, 1846. For the present we shall not inquire which may have passed either or both Houses first, nor which was first approved by the Governor. We shall notice the history of the proceedings more fully hereafter.

The only provision in the Revised Statutes of 1846, having express reference to escheats or escheated estates, is the following (*Sub. 9, Sec. 1, Ch. 67,* entitled " Of title to real property by descent" ): " If the intestate shall leave no widow nor kindred, his estate shall escheat to the people of this state for the use of the primary school fund."

Now, the first thing to be noticed of this provision, is, that like the provisions of the same chapter in reference to descents, it applies only to the future, and not to the past. Lands which had previously escheated to the territory or the state, no more come within its terms or intent than descents which occurred under former laws, would come within or be governed by the other portions of this chapter, providing for title by descent, of which this provision regarding escheats forms a part. This subdivision only provides for future escheats, as the others do for future descents. But the question, whether any particular land had escheated, or whether it descended to heirs, would alike be decided by the law in force at the death of the owner.

And as to lands escheated prior to this provision of the Revised Statutes, their disposition or sale and the appropriation of the proceeds must depend upon other laws, previously, contemporaneously or subsequently passed. Since the provision above cited from the revision does not apply, at all, to the sale or the disposition of the proceeds of previously escheated lands, and, as already decided in the case when formerly before us, the escheat, if any, in the present case accrued to the territory under the territorial laws, and became vested in the state, as the successor of the territory, by section three of the schedule to the Constitution of 1835, on the change from the territorial to the state government, and thus came within the fair meaning of the special act as "Lands escheated to the state."

Secondly, this subdivision above cited gives no power *to sell any escheated lands,* even those which should escheat under its provisions.

It is, therefore, we think, very clear that this provision of the Revised Statutes of 1846 has no application whatever to the escheat or to the lands in question in the present case.

The Constitution of 1835, in force at the time of that revision,—unlike that of 1850,—made no appropriation of the proceeds of escheated lands to the school fund or to any other fund, and none for their sale or disposition, but left the whole matter in these respects open to legislation; and, though the schedule to that Constitution (as already noticed) had the effect to transfer from the territory to the state, lands previously escheated to the territory,—neither that, nor any other provision of that constitution, nor of the Revised Statutes nor of any other law, had converted these lands into "school lands," as urged by the counsel for the defendants in error, nor appropriated the

proceeds to the school fund or any other fund until by this special act they were appropriated to the general fund, as hereafter noticed. .

Did any other portion of the Revised Statutes of 1846 make any provision, or give any power for the sale of lands thus previously escheated?

We have looked in vain for any such provision. Title XII. (entitled " Of the public lands and the superintendance and disposition thereof") Chap. 59, Sec. 11, in reference to the powers and duties of the Commissioner of the Land Office, makes the following general provision: "The said Commissioner shall have the general charge and supervision of all lands belonging to the state, or which may hereafter become its property, and also of the lands in which the state has an interest, or which are, or may be, held in trust by the state for any purpose mentioned in this title, and may superintend, lease, sell and dispose of the same in such manner as shall be directed by law."

Now, looking to this general provision alone, without reference to the special act in question, the general terms used seem to be broad enough to place the charge and supervision of these escheated lands in the hands of the Commissioner. But it will be noticed that he can only "lease, sell or dispose" of any of the lands included in the section " in such manner as shall be directed by law." The Commissioner then, had no power under this section to sell any lands whatever, unless, and only so far as, some other provision of the Revised Statutes, or of some other statute, had provided or should provide the manner in which he should make the sale; and in such case the law prescribing the manner in which he should make the sale would give him the power of sale, without the aid of this section.

The only provisions in the Revised Statutes of 1846, or

22 MICH.—42.

:any other statute (up to that time at least), directing or prescribing the manner in which any of the lands mentioned in section eleven of chapter fifty-nine, above quoted, are to be found in the next chapter (60) of the same title; :and these provisions extend only, First, to " University and school lands" (*Sections 1 to 27* inclusive); Second, to ·" State building lands" (*Sections 28 and 29*); Third, to ·" Salt spring lands" (*Sections 30 to 35* inclusive); Fourth, To "Internal improvement lands" (*Sections 36 and 37, 40 to 48* inclusive); and, Fifth (if these are ·not also to be treated as strictly " Internal improvement lands"), to lands " the title to which has been or may be derived from any :source in the payment or collection of debts to the state" (*Sections 38 and 39*).

It is not claimed that these escheated lands could possibly fall within any of the above classes, except school lands, :and, we have already shown that they did not fall within that class.

Such, then, under the revision of 1846, *without the* :special act, would have been the state of law in reference to formerly escheated lands when the revision should take ·effect. There would have been no power of selling escheated lands, whether they escheated before or after the revision, .and, of course, no appropriation of the proceeds (which ·could only arise from the sale) to any one of the state funds. The Legislature must be presumed to have understood that such would be the state of the law under the revision they were enacting.

In this state of things, on the same day when the· revision, as one entire act, finally passed, viz: on the 16th day of May, 1846, this special act, as appears by the journal, was introduced into the Senate, and, the rules being suspended, it was passed, and sent to the House, where it also passed on the same day. The action of the House

upon the special act seems, by the journal, to have been after its final action upon the act constituting the revision. But as the Senate kept a journal of the proceedings upon the revision separate from that of the general legislation, it is not possible to ascertain with certainty which was first passed by that body, nor which was first approved by the Governor,—though a loose inference may be drawn that the Governor's approval of the special act was communicated to the Senate prior to his approval of the revision. The revision, though finally passed and approved as an entire act, had, after being perfected in separate titles or parts to the satisfaction of both Houses, been sent to the Governor in such parts for examination from time to time, previous to the final adoption as one act; and the title in reference to the "superintendence and sale of the public lands" had thus been passed through both Houses and submitted to the Governor on the 5th day of May.

Both the Revised Statutes, as a whole, and the special act in question were, however, approved by the Governor on the same day, May 18th, 1846; and which was first actually passed by the Legislature or first approved by the Governor, we do not deem at all material to the discovery of the legislative intent. It is sufficiently certain that both were practically under the legislative consideration at the same time, and were, properly speaking, cotemporaneous acts, and should be construed as such in arriving at the intention of the Legislature. One thing, at least, is clear, that the Legislature were not satisfied with the provision made in the Revised Statutes in respect to escheated lands, and intended to make some further provision by this act.

Had they been satisfied with the law as it would be when the revision should take effect, and wished only to provide for the intervening period, they would naturally have either given immediate effect to that portion of the

revision which they supposed covered the case, or would have passed a special act containing only the same provisions.

Let us now inquire what were the provisions they did actually make by the special act. It provides (see the act *Comp. L., Sec. 280*) "that the trustees appointed under the 'Act to provide for the collection of certain assets transferred to the State, and for other purposes,' approved February 17, 1842, shall take charge of all lands or other property which may have escheated, or which may hereafter escheat to the State by reason of the owner thereof dying intestate and leaving no legal heirs thereto, according to the statutes in such case made and provided; and the said trustees may sell or otherwise dispose of the said lands or property in such manner as they may deem for the best interests of the State, and they shall have power to convey, by deed to the purchaser thereof, all the rights of the State therein; and they shall deposit all proceeds arising therefrom in the State Treasury, to the credit of the general fund.

" Sec. 2. This act shall take effect and be in force from and after its passage."

Now it is manifest from the face of this act—1st. That it applies as well to lands previously escheated as to those which should thereafter escheat,—while *Sub. 9 of Sec. 1, Chapter 67* of the revision applied only to the latter.

2d. That this act does not assume or purport, like subdivision nine of section one above referred to, to provide when or how, or for what cause, or upon what contingency, lands shall escheat, but leaves all that to be governed by other statutes.

3d. That the main purpose of this act was to provide for a sale of all escheated lands for the public benefit, and, as an object in its nature of secondary importance, to pre-

scribe to what particular state fund the proceeds should be credited. The Revised Statutes provided for no sale of such lands, whether already escheated or thereafter to escheat, without which there could be no proceeds of sale to go to any fund. They undertook to appropriate the lands only which should thereafter escheat, to the school fund ; but this appropriation even was ineffectual, for want of power to sell.

In carrying out their object by this special act, the Legislature very clearly gave to the officers referred to (Auditor General, State Treasurer, and Secretary of State) full power to sell all lands which had already escheated or should subsequently escheat; and they undertook to appropriate the proceeds to the *general fund*.

It will thus be seen, that with the exception of the appropriation of the proceeds of lands thereafter to escheat, this special act covers a field wholly unoccupied by any provision of the Revised Statutes.

We can, therefore, see no possible room to doubt the legislative intention, by this act, to make permanent provision for the sale of both classes of escheated lands, and for the appropriation of the proceeds of all which had previously escheated, at least, and that this provision should be additional to all the provisions contained in the Revised Statutes. The present case calls for no opinion, and we express none, whether the proceeds of lands thereafter to escheat would go to the school fund under the provision cited from the Revised Statutes, after they took effect, or to the general fund under the special act.

It is true, however, that by this special act the officers referred to are required to "*take charge* of all lands escheated or to escheat," etc.; and that so far as the right or duty to "take charge of" these lands is concerned, this act may

seem to conflict with the general provisions of Section 11, Chapter 59, of the revision, giving to the Commissioner of the Land Office the "general charge and supervision of all lands belonging to the state, etc."

But considering these as cotemporaneous statutes, and that they should, therefore, be construed together; and, as already shown, that the intention is perfectly clear that the main provisions of the special act were intended to have permanent effect as well after as before the revision should take effect, thus providing a special mode of selling and disposing of such escheated lands in a different manner from that provided for other lands; and that the provisions of *Section 11 of Chapter 59* are general, applying to many classes of lands, while those of the special act are special and particular, referring to but one class, we think this a proper case for the application of the familiar rule for the construction of statutes,—that where there are two acts or provisions, one of which is special and particular, and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision, especially when such general and special acts or provisions are cotemporaneous, as the Legislature are not to be presumed to have intended a conflict. See *Dwarris on Statutes, 2d ed., 513, 668; Standen v. University of Oxford, W. Jones, 17, 26; Nichols v. Bertram, 3 Pick., 342; State v. Rackley, 2 Blackf., 249; Stockett v. Bird, 18 Md., 484; McFarland v. State, 4 Pike, 410; Pearce v. Bank of Mobile, 33 Ala., 693; Brown v. Co. Commissioners, 21 Penn. St., 37; Ottawa v. La Salle, 11 Ill., 654; Fosdick v. Perrysburg, 14 Ohio, N. S., 472; Black v. Scott, 2 Brock., 325.* The

authorities would warrant the statement of the rule of construction in much broader terms than I have given it, and this case falls far within its limits.

The considerations already stated are sufficient to establish beyond a reasonable doubt, that the special act was not intended to be repealed by the taking effect of the Revised Statutes.

An examination of *Title 33* of the Revised Statutes does not in any manner tend to weaken, if it does not even strengthen this conclusion. The first section, after providing when the revision shall take effect, proceeds thus: "And from and after the day last mentioned (March 1, 1847), the following acts and parts of acts, heretofore passed by the Legislature, shall be repealed, to wit:"—then follows a list by their titles of two hundred and thirty-four acts, among which this special act is not included; which, if it had actually passed before the revision and was only intended to operate temporarily until the revision should take effect, would, in all probability, have been included, as the Legislature would not have been so likely to overlook this as acts passed many years before. It will also be noticed that the act of February 17, 1842, appointing these officers as trustees for another purpose, and referred to in the special act for the purpose of defining the trusts, is not among the list of acts repealed, but was still to be left in force after the revision should take effect. After this enumeration of acts to be repealed by the taking effect of the revision, the section closes with this general language: "And all other acts and parts of acts the subjects whereof are revised and re-enacted in these Revised Statutes, or which are repugnant to the provisions therein contained."

Now, as the main subject and primary object of this special act was to provide for the sale of escheated lands, and that subject is untouched by the revision, it is clear

the "subject" of this act was not revised and consolidated
in the Revised Statutes, within the meaning of this repeal-
ing section, and as to previously escheated lands, at least,
there is not the least even apparent conflict between this special
act and any provision of the Revised Statutes, except in the mere
matter of "taking charge or supervision of the lands," and this,
as we have seen, is rather apparent than real. But, if the
conflict upon this point were real, it could in no way affect
the power of sale, upon which there is no conflict apparent
or real. There is nothing absurd or inconsistent in placing
the general charge and supervision of lands under one
agency, and the power of making sale in another.

The revisor, who prepared the revision for the action of
the Legislature, who, as a member, took the most promi-
nent part in its adoption, and afterwards superintended its
publication, on page 760, appends a "list of acts not repealed
and consolidated in the Revised Statutes," and in that list,
describing them by their titles, enumerates this act.

The compiler and the commissioners who, under the act
of 1857, prepared and reprinted the present compilation
of "the laws of this state" seem also to have been of the
same opinion, having included it in that compilation with-
out note or comment.

The idea of such a repeal seems, so far as we are informed,
to have been started for the first time, on the second trial
of this cause at the circuit, after our former decision
involving and sustaining the validity of the deed. And,
though this question was as clearly involved in the case,
as then presented, as it is now, and our former decision
might be considered as precluding the present discussion;
yet, as the point was not argued, nor even suggested, on
that hearing, we have treated it as an open question, and
given it the same deliberate consideration as if now hearing
the case for the first time.

Second,—we are next to inquire whether, or how far, this special act has been repealed or modified by the present Constitution of 1850, which took effect January 1st, 1851.

*Section two of Article XIII.* of this Constitution, is in these words: "SEC. 2. The proceeds from the sales of all lands that have been or hereafter may be granted by the United States to the state, for educational purposes, and the proceeds of all lands or other property given by individuals, or appropriated by the state for like purposes, shall be and remain a perpetual fund, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and annually applied to the specific objects of the original gift, grant or appropriation."

This section, if it includes escheated lands, must include them in the clause, "or appropriated by the state for like purposes," but if included in this or any other class mentioned, the only effect would be to make the special appropriation mentioned in the next section an "inviolable" appropriation; and this would have been equally inviolable *without* the aid of the *second* section. But the truth is, that this section makes no provision at all in reference to escheated lands. These, so far as they are provided for at all, come within the special provisions of the next section, which is confined exclusively to escheats, the lands escheated and the appropriation of the proceeds. It is in the following words:

"SEC. 3. All lands, the titles to which shall fail, from a defect of heirs, shall escheat to the state, and the interest on the clear proceeds from the sales thereof, shall be appropriated exclusively to the support of primary schools."

Now, it is clear that the latter provision of this section, appropriating proceeds, is no more extensive than the former portion providing for escheats, and that it applies to no

22 MICH.—43.

other lands than such as "shall escheat," and the title to which "shall fail from a defect of heirs," under the former portion of the section. But it is unnecessary to determine,— 1st, whether this provision applies at all to escheats which had already taken place under former laws, by the death of the owner, without heirs, prior to the adoption of the Constitution, or, 2d, whether it applies only to cases when the escheat should subsequently take place from the same cause, under the operation of its provisions. See *Cooley's Const. Lim.*, pp. *62* and *63*, and cases cited. If the latter be the true interpretation, then this section has no bearing or effect upon the present case. It does not even appropriate the proceeds of these lands, nor the interest on the proceeds, to the primary school fund. If the former be the true interpretation, it is still equally clear that it conflicts with the special act in question *only* upon the *single point* of the disposition of the proceeds, changing their destination from the "general" to the "school fund," and leaving all the other provisions of the act untouched and in full operation ; for it is quite certain that, while this section contemplates that the lands will be sold, it does not, of itself, give any power by which any officer, officers, or agency of the state, could proceed to sell them; but it contemplates a sale to be made, either under existing statute authority, or under some statutary regulation to be subsequently passed.

We think it equally certain, upon either construction, that this constitutional provision did not have the effect, as claimed by the counsel for the defendants in error, to convert the escheated lands mentioned in it, into primary school lands, so as to bring their sale and disposition within the provisions of chapter sixty of the Revised Statutes (*Comp. L., Chap. 82*), and we are by no means satisfied it

would have this effect, if the special act in question had not been in existence; but as the act was in existence we need not discuss this abstract question.

This special act, so far as regards any question essential to the decision of this case, had, in our opinion, the same full force and effect on the 18th day of April, 1868, when the deed in question was executed to Crane, as it had when it took effect on the day of its passage; and under it, the power of sale in the officers who executed it was full and complete.

The only remaining question, if it can still be called an open question, not fully argued in the case when formerly before us (though necessarily involved in the decision), is whether these officers had the power to sell without first offering the lands at public sale. The act itself prescribes no such condition to the exercise of the power, as it would have been very natural, at least, considering our whole course of legislation, to have done, if such condition was intended to be required. But upon this point, the act, as it seems to us, goes beyond mere silence. It provides that they "may sell or otherwise dispose of the said lands or property, *in such manner as they may deem for the best interests of the state.*" The whole matter of time and manner of making sale and of judging what mode would best subserve the interest of the state, seems to have been purposely left to their discretion; and they having exercised it, we have no power to review their discretion or overrule their judgment.

We are aware of no statute or of any principle of the common law, which requires trustees, having a power of sale express and unqualified like this, in the statute by which it is conferred, to sell only at public auction, or first to offer the property at public sale. In fact, the whole argument in support of such a condition to the exercise of

the power is rested by the counsel for the defendants in error upon the position (which serves as its premises) that these are school lands, within the provisions of chapter sixty of the Revised Statutes of 1846 (*Comp. L., Ch. 82*), a proposition which, as already stated, cannot, in our opinion, be maintained.     This proposition failing, the conclusions dependent upon it must fail with it.

It might perhaps have been more conducive to the public interest for the Legislature to have required a public sale, or an offering at public sale, before the lands should be disposed of at private sale; yet the argument upon this question would not be all on one side.  If this were required, the stimulus of private interest would be wanting to bring the facts of such escheats to the knowledge of the state officers, and the lands might fall into, or continue in, the hands of mere intruders, to the prejudice of the public right. On the other hand, where the escheat is one which has long since occurred, and the occupant, though originally an intruder, has remained many years in peaceable possession, treating the property as his own, making improvements and converting it into a homestead, where his family have been reared and allowed, perhaps, to rest in the belief of one day succeeding to it as their own, the hardship and even the injustice of seizing it at all for the benefit of the public treasury, becomes little less than it would have been if the original possession had been rightful.  And in such cases it might seem to the Legislature—as it certainly seems to me—it would be wiser policy for the state to forego its claims, and leave such occupants in possession, than to sell the property at private sale, without inviting competition or giving the occupant an opportunity to preserve his possession by competing at the sale.  But these are considerations of policy appealing to the good sense of the Legislature, and bearing as well upon the question of a

CRANE v. REEDER.

proper statute of limitations, as upon the mode of sale. All questions of this kind the Legislature have a right to decide, while the courts have none.

It might have been more judicious for the state officers, though the statute did not require it, after the escheat was brought to their attention, to have offered the lands at public sale. But this is equally a question of policy or discretion which was within their jurisdiction to decide, and which we have no power or inclination to review.

Upon full consideration, therefore, we are all of opinion that the Circuit Judge erred in refusing to admit the deed in evidence.

The judgment must, therefore, be reversed with costs, and a new trial awarded.

The other Justices concurred.