## THE PEOPLE *ex rel.* William L. Vandeventer
### *v.*
## JAMES A. ROSE.

*Opinion filed June 16, 1903.*

1. CONSTITUTIONAL LAW—*power of legislature to change Supreme Court districts.* The legislature has power to change the boundaries of the Supreme Court districts at any time and in any manner not expressly or impliedly prohibited by the constitution.

2. SAME—*general power carries necessary particular powers.* A general power conferred upon the legislature carries with it, by implication, every particular power necessary to carry the general power into effect.

3. SAME—*legislature, in changing boundary of a district, may make incidental changes in others.* Under section 5 of article 6 of the constitution, providing that the boundaries of Supreme Court districts may be changed at the session of the legislature next preceding the election of judges therein, the legislature, at its session next preceding the election of a judge in one district, may change the boundaries of such district even though the boundaries of other districts are incidentally changed.

4. SAME—*act of April 3, 1903, changing boundary of fourth district, is constitutional.* The act of April 3, 1903, changing the boundaries of the Fourth Supreme Court District, in which an election was to succeed the session at which the act was passed, is constitutional, notwithstanding incidental changes were made in the second, fifth and sixth districts, in none of which was any election for judge to be held before the next session of the legislature.

5. SAME—*court cannot investigate motives of legislature.* The courts cannot investigate the motives of the legislature in passing a redistricting law, but must presume that it acted in good faith and for the best interest of the State.

6. SAME—*legislature has discretion in matter of population and territory.* If any attempt has been made by the legislature, in changing the boundaries of a judicial district, to comply with the requirements of the constitution concerning equality of population and contiguity and compactness of territory, the courts are powerless to review the legislative discretion so exercised in observing such requirements.

MAGRUDER, J., dissenting; BOGGS and RICKS, JJ., specially concurring.

ORIGINAL petition for *mandamus.*

This is a petition for a writ of *mandamus*, filed in this court in the name of the People, on the relation of William L. Vandeventer, against James A. Rose, Secretary of State of the State of Illinois.

The petition avers that the relator is upwards of thirty years of age, is a duly licensed attorney at law, a resident of the Fourth Supreme Court District of this State and a citizen of the United States; that at a delegate convention representing the democratic party of said district, held, pursuant to call, on April 17, 1903, for the purpose of nominating a candidate for the office of judge of the Supreme Court for said district, he was duly nominated as a candidate of said party for the said office; that on April 18, 1903, said Vandeventer presented to the Secretary of State a certificate of his nomination in due form, which the Secretary refused to file, and prays that a writ of. *mandamus* issue against James A. Rose, as Secretary of State, commanding and requiring him to receive the certificate of nomination of said William L. Vandeventer as a candidate for judge of the Supreme Court for the Fourth Supreme Court District of the State of Illinois as created by the constitution of 1870, and composed of the following counties: Fulton, McDonough, Hancock, Schuyler, Brown, Adams, Pike, Mason, Menard, Morgan, Cass and Scott, and to file the same in his office, and to certify to each of the county clerks in said counties the name of William L. Vandeventer as the democratic candidate for judge of the Supreme Court for the Fourth Supreme Court District, to be voted for at the election to be held on the first Monday in the month of June, 1903.

The petition, by leave of court, having been filed, the Secretary of State, by the Attorney General, entered his appearance and filed an answer to said petition, in which it was averred that the Fourth Supreme Court District, as now constituted, is not composed of said counties of

Fulton, McDonough, Hancock, Schuyler, Brown, Adams, Pike, Mason, Menard, Morgan, Cass and Scott, and averred that the said Fourth Supreme Court District, as now constituted, contains the following counties: Fulton, McDonough, Hancock, Schuyler, Brown, Adams, Mason, Menard, Morgan, Cass, Rock Island, Mercer, Warren and Henderson, and no other, and charged that the boundaries of the Fourth Supreme Court District, as carved out by the constitution of 1870, were changed by virtue of an act of the General Assembly entitled "An act changing the boundaries of the Fourth Supreme Court District of the State of Illinois, and thereby affecting the boundaries of other districts therein named, and providing for an election in said fourth district," which was approved by the Governor on the third day of April, 1903, and was in force from the day of its approval, a certified copy of which act was attached to said answer and is as follows, omitting the title:

"Whereas, the constitution of this State provides that the boundaries of the districts for the election therein of judges of the Supreme Court may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time; and whereas, there will be held an election for a judge of the Supreme Court in the said Fourth Supreme Court District on the first Monday of June, 1903, under the constitution of this State; and whereas, said Fourth Supreme Court District has a less number of inhabitants by more than 100,000, according to the census of 1900, than any other one of the seven districts for the election of supreme judges in the State of Illinois.    Therefore,

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That the boundaries of the said Fourth Supreme Court District are hereby changed so that after the passage of this act, said district shall be composed of the following counties, to-wit: Rock Island, Mercer, Warren, Henderson, Fulton,

McDonough, Hancock, Adams, Schuyler, Brown, Mason, Menard, Morgan and Cass.

"Sec. 2. After the passage of this act, said county of Rock Island shall cease to be a part of the sixth judicial district for the election of supreme judge and shall constitute a part of said fourth district as hereinbefore provided; said counties of Mercer, Warren and Henderson shall cease to be a part of the fifth district for the election of supreme judge and shall constitute a part of said fourth district as hereinbefore provided; and said counties of Pike and Scott shall cease to be a part of said fourth district and are added to and shall form a part of the second district for the election of supreme judge.

"Sec. 3. On the first Monday of June, A. D. 1903, and every nine years thereafter as provided by law, there shall be elected a judge of the Supreme Court in said fourth district as composed of the counties mentioned in section 1 of this act."

On April 22, 1903, a stipulation in writing was filed by the parties, to the effect that in the hearing of the above entitled cause the question for consideration and the determination of this court is the constitutionality of said act of the legislature.

CARL E. EPLER, and W. E. WILLIAMS, for relator.

H. J. HAMLIN, Attorney General, for respondent.

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

This action was commenced with a view to test the constitutionality of the act passed by the last General Assembly, set out in full in the statement preceding this opinion, changing the boundaries of the Fourth Supreme Court District by detaching the counties of Pike and Scott therefrom and attaching them to the second district, and by detaching Rock Island county from the

sixth district and Mercer, Warren and Henderson counties from the fifth district and attaching them to the fourth district. In considering the question here raised it should not be forgotten that, in general, the constitution is a limitation upon the power of, and not a grant of power to, the General Assembly, and that it may make any change, at any time and in any manner, in the boundaries of the Supreme Court districts which it may deem wise and expedient, except in so far as the right to make such change has been in express terms or by necessary implication limited by the constitution. (Cooley's Const. Lim.—2d ed.—p. 86.)

The provision of the constitution fixing the time when changes in the Supreme Court districts may be made is as follows: "The boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time." The only limitation found in this provision as to the time when the boundaries of the districts may be changed is, that the change must be made at the session of the General Assembly next preceding the election for judges therein. Under the constitution a judge of the Supreme Court for the fourth district is to be elected on the first Monday of June, 1903, and the act changing the boundaries of said district was passed at the session of the General Assembly next preceding the election for judge in said district, and as we view the matter the General Assembly at that session was authorized to make such change, (*People* v. *Rose*, 166 Ill. 422,) and it seems too plain for argument that unless we are right in so holding, the boundaries of the fourth district can never be changed, unless the limitation that the change must be made at the session of the General Assembly next preceding the election for judges therein is to be entirely eliminated from the constitution.

It is, however, said, that the act not only changes the boundaries of the fourth district, wherein a judge is to

be elected in 1903, but it also changes the boundaries
of the second, fifth and sixth districts, and that as no
judge is to be elected in said districts, or any one of
them, in 1903, the act is unconstitutional. While it seems
clear that the General Assembly would have been pow-
erless to pass an act changing the boundaries of the
second, fifth and sixth districts, or any one of them, at
the last session, that session not being the session next
preceding the election for judges in said districts, as no
election will take place in the second and sixth districts
until 1906 and in the fifth district until 1909, yet if the
General Assembly had power, as we think it did have, at
its last session, to change the boundaries of the fourth
district, it had power to make such incidental changes
in the second, fifth and sixth districts as might be neces-
sary to accomplish the change in the fourth district, as
no change could be made in the fourth district without
changing some one or more of the other districts, and
the principle is well settled that where a general power
is conferred upon the General Assembly by the consti-
tution, or a duty imposed, it also gives, by implication,
every particular power necessary for the exercise of the
one or the performance of the other. (*Field* v. *People*, 2
Scam. 79; *City of Chicago* v. *Stratton*, 162 Ill. 494; Cooley's
Const. Lim.—2d ed.—p. 63.) In *Field* v. *People, supra*, on
page 83 the court said: "That other powers than those
expressly granted may be, and often are, conferred by
implication, is too well settled to be doubted. Under
every constitution the doctrine of implication must be
resorted to in order to carry out the general grants of
power. A constitution cannot, from its very nature, en-
ter into a minute specification of all the minor powers
naturally and obviously included in and flowing from the
great and important ones which are expressly granted.
It is therefore established, as a general rule, that when
a constitution gives a general power or enjoins a duty,
it also gives, by implication, every particular power nec-

essary for the exercise of the one or the performance of the other." And in *City of Chicago* v. *Stratton, supra,* on page 503 it is said: "A grant of legislative power to do a certain thing carries with it the power to use all necessary and proper means to accomplish the end."

We therefore conclude that the General Assembly, at its last session, had power to change the boundaries of the fourth district, and in effecting such change had the right to make such incidental changes in the boundaries of the second, fifth and sixth districts as were necessary to accomplish the change in the fourth district. This view we think is strongly supported by the last clause of section 5 of article 6 of the constitution, which provides: "The alteration of the districts shall not affect the tenure of office of any judge." It is evident from this provision that the framers of the constitution realized that changes might be made in districts wherein the term of office of the then sitting judge would not expire in June following the action of the General Assembly, and that the tenure of his office might, but for this limitation, be affected by such change, as under the constitution a judge of the Supreme Court is required to be a resident of the district in which he is elected, and they therefore inserted the foregoing provision to guard against such result.

In reaching this conclusion we are not unmindful of the fact that the constitutional provision providing for changes in the boundaries of districts uses the words "district" and "judge" in the plural. We are, however, clear that fact is not controlling. There is a seeming conflict between sections 5 and 6 of article 6 of the constitution in this: By section 6 it appears that all the judges of the Supreme Court are not elected at the same time, while section 5 provides for a change in the boundaries of the districts "at the session of the General Assembly next preceding the election for judges therein." This undoubtedly arose from the fact that under the consti-

tution of 1848 the State was divided into three Supreme Court districts, the court consisting of three judges, who held their respective offices for nine years, except the judges who were first elected, who held office for three, six and nine years, respectively, the length of their terms being determined by lot, after which one judge was elected every three years and held his office for nine years. At the time of the adoption of the constitution of 1870 that condition existed, and while the Supreme Court districts were increased to seven in number and the members of the court to a like number, the three judges holding office under the constitution of 1848 were in office, and as the term of office of only one expired in June, 1870, the other two judges had the term of three and six years, respectively, to serve, which limited the number of judges to be elected in 1870 to five, and necessitated an election of one judge in 1873 and one in 1876 as successors to the judges elected under the constitution of 1848, the effect of which is, that an election for one or more of the Supreme Court judges, under the constitution of 1870, occurs every three years. We think, however, there is no real conflict when the sections are read together, and the seeming conflict is entirely eliminated if the view be adopted that a change may be made by the General Assembly in any district, with such incidental changes in other districts as may be necessary to effect said change, at its session next prior to the election of a judge in said district, and no other view that has been suggested does to our minds harmonize such sections.

It is further contended the General Assembly, in making the change in the boundaries of the Fourth Supreme Court District sought to be accomplished by said act, failed to make said change upon the rule of equality of population, and for that reason the act is unconstitutional and void. The constitution provides, "whenever such alterations shall be made, the same shall be upon the rule of equality of population, as nearly as county

boundaries will allow." It is apparent that a compliance with said provision involves the exercise of discretion and judgment upon the part of the General Assembly, and the law is well settled that the discretion reposed in the law-making branch of the State in passing laws of this character cannot be controlled by the courts. Neither can a court substitute its judgment for that of the General Assembly, and hold an apportionment statute unconstitutional by reason of the fact that had the court framed the law the result would have been different. Nor can the court set out upon an investigation of the motives which actuated the members of the General Assembly, individually or collectively, in voting for and passing the law, but it is·bound to presume that they were actuated by patriotic motives and acted in view of what they believed to be for the best interests of the State, (*People* v. *Thompson,* 155 Ill. 451,) and "to the extent an act of the legislature is an expression of the discretion and judgment reposed in the General Assembly, the action of the representatives of the People in the legislature assembled must be regarded as final, and not within the power of the court to review unless the discretion has been plainly so grossly abused as that it may be said it was not exercised at all." (*People* v. *Carlock,* 198 Ill. 150, at p. 157.) If the fourth district, the boundaries of which are affected by this act, is taken as a basis for comparison, it will be found that prior to the passage of the act the difference in population between the second and fourth districts was 149,034 and after its passage the difference was 122,492, which was an approach of 26,542 towards equality of population between said districts. The difference in population between the fourth and sixth districts before the act was passed was 115,144 while after its passage the difference was 8735, which was an approach of 106,409 towards equality of population; and while before the act was passed the fifth district exceeded the fourth in population 105,684, after its passage

the fourth exceeded in population the fifth 15,853, which was also an approach towards equality of population, and as the new fourth district has a population of 68,143 greater than the old fourth district, and no change was made in the population of either the first, third or seventh districts, there was an approach of 68,143 towards equality of population between the fourth and the first, third and seventh districts. It is therefore apparent, as was said in *People* v. *Thompson*, *supra*, that the General Assembly did have in view, and did apply to some extent, the rule of equality in population in altering the boundaries of said fourth district. In *People* v. *Carlock*, *supra*, on page 160 it was said: "While it is for the courts to determine whether the rule prescribed by the constitution governing apportionments has been observed at all or not in any given case, it is the province of the legislature, subject to the more definite limitations fixed by the constitution, to determine what approximation can be made toward exact equality in population,—in other words, how the apportionment can be made so that the districts will contain, 'as nearly as practicable, an equal number of inhabitants.' This is left to the legislative judgment and is not subject to judicial control." While what was said there was in a legislative apportionment case, it applies with equal force here. Mr. Cooley, speaking upon the same subject, (Cooley's Const. Lim.— 2d ed.—p. 129,) says: "Where the power which is exercised is legislative in its character, the courts can enforce only those limitations which the constitution imposes, and not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism and sense of justice of their representatives."

The fact that the change in the boundaries of the fourth district was made by taking the counties of Pike and Scott therefrom and adding them to the second district, and by taking the county of Rock Island from the

sixth and the counties of Mercer, Warren and Henderson from the fifth district and adding them to the fourth, we deem to be not a matter of judicial control, but as falling within the discretion vested in the legislature. Under the constitution, when the boundaries of the fourth district were changed the General Assembly was required to make such change so that the district changed, as well as the remaining districts in the State, should "be composed of contiguous counties, in as nearly compact form as circumstances will permit." In determining the question of contiguity and compactness the General Assembly was possessed of a wide discretion, and in order to bring about such contiguity and compactness it was doubtless deemed wise by it to change the boundaries of the fourth district by adding counties thereto and by taking counties therefrom, as in making such change it was powerless to divide a county. If in looking at the district as formed it can be seen there was an attempt to obey the constitution by observing the rules of equality of population and contiguity and compactness of territory, the court is powerless to review said action. As was said in *People* v. *Carlock, supra* (p. 157): "Whether the principles of the constitutional requirements of compactness of territory and equality of population * * * have been applied at all is one which the courts may finally determine, but whether or not the nearest practicable approximation to perfect compactness and equality has been obtained is a question for legislative discretion. The attempt on the part of the court to condemn an apportionment act merely on the ground an apportionment conforming more nearly to the constitutional requirements, in which a discretion was involved, could be made, would be to invade the province of the legislative department of the State."

That there is contiguity of territory in the new district is not questioned, nor, in our opinion, can it be successfully contended that the district as created is not in

compact form, within the meaning of the constitution. The words "be composed of contiguous counties in as nearly compact form as circumstances will permit," as used in the constitution, when applied to the subject now under consideration, mean that the counties composing a Supreme Court district must touch each other and be as closely united as circumstances will permit. By reason of the fact that in forming a Supreme Court district the legislature cannot divide a county and are required to take into consideration equality of population as applied to all the districts in the State, it is evident to all that a Supreme Court district cannot easily be created which will be in the form of a square or that of a parallelogram, but that its boundaries must conform to county lines, with all their irregularities. And the fact that the old district is more nearly square or more symmetrical in form than the new district will not justify the court, upon that fact alone, in holding the statute unconstitutional. In other words, the court cannot declare the act unconstitutional by simply looking at a map of the State or a part thereof, but in passing upon the constitutionality of the act many matters besides the form of the district must be taken into consideration. A glance at the map of the State, however, will show that the fifth and sixth Supreme Court districts,—especially the sixth, —are much more compact in form now than they were before the act in question was passed; and in changing the boundaries of the fourth district it was the duty of the legislature to consider contiguity and compactness of territory in the other districts as they would exist after the change in the fourth district. Where, as here, the boundaries of a district are confined to county lines, and in its formation it clearly appears that the questions of equality of population and contiguity and compactness of territory have been taken into consideration by the law-making power in forming the district, the domain of legislative discretion has been reached and that dis-

cretion cannot be controlled by the courts. All govern-
mental power in the State is divided into three branches,
viz., legislative, executive and judicial, and the limits of
each are definitely fixed by the constitution and must
not be overstepped. Neither may the one encroach upon
the powers conferred upon the other. The courts have
the power to declare an act of the legislature unconsti-
tutional which is clearly in conflict with the fundamental
law of the State; but for the courts to attempt to draw
to themselves the power to abrogate laws as being un-
constitutional, and to overthrow the legislative will as
there expressed, simply because they may be thought to
be impolitic, ill-advised, unwise or unjust, when they are
clearly constitutional and valid, would be revolutionary
in the extreme and would soon subvert all constitutional
form of government. For the courts to hold a valid law
unconstitutional through whim or caprice is no less a
violation of the constitution than it is for the legislature
to pass a law which is clearly not authorized by the con-
stitution. The functions of the courts are purely judi-
cial, and not legislative or political.

In passing upon the constitutionality of a statute it
must be borne in mind, where there is a reasonable doubt
as to whether or not the act is valid, the courts will in-
cline in favor of the law and hold it valid. In *People* v.
*Gaulter*, 149 Ill. 39, it was said (p. 47): "Courts ought not
to declare an act of the legislature invalid unless it is in
plain and obvious conflict with the constitution. Where
there is a reasonable doubt of the validity of the statute
such doubt should be solved in favor of the legislative ac-
tion, so as to sustain the statute. The presumptions are
in favor of the constitutionality of a law passed by the
legislature, and the courts will, if possible, give it such a
construction as will enable it to have effect." In *Gaines*
v. *Williams*, 146 Ill. 450, it was said (p. 454): "The right
of the judiciary to declare a statute void and arrest its
execution is one which, in the opinion of all courts, is

coupled with responsibilities so grave that it is never to be exercised except in very clear cases."

We are of the opinion that the act passed by the last General Assembly changing the boundaries of the Fourth Supreme Court District is a valid enactment and must be sustained. The writ of *mandamus* will therefore be denied.

*Writ denied.*

Mr. JUSTICE CARTER took no part in the consideration or decision of this case.

Separate concurring opinion of BOGGS and RICKS, JJ.:

The legislature of 1903 changed the boundaries of the Fourth Supreme Judicial District of this State by taking therefrom Pike and Scott counties. and adding thereto Rock Island, Mercer, Warren and Henderson. counties, and its power to do so being questioned by the application for the writ of *mandamus* in this case, the majority of this court held that the legislature acted within its powers and that its action was valid. In this opinion we concur.

The legislature is the law-making power of the State, and those composing it are selected to discharge that duty by the people of the State. Upon it is cast the duty of formulating and enacting the laws for the government of the people and the regulation of their civil and political rights. Coming from the body of the people and directly representing the people, the legislation adopted by the members of the legislature must be presumed by this court to be the declaration of the will of the people. It is both necessary and proper, in the discharge of this high duty cast directly upon them, that the courts and all the people shall, until the contrary is shown, presume that they are acting within the scope of their powers. The limitation upon the power of legislation was fixed by the people and is found in the constitution. That instrument, instead of being a delegation of power, has been recognized by all the courts of this

country as simply a limitation upon those powers, and when their acts are questioned, unless there be found in the constitution some declaration limiting or prohibiting such acts, they must be given full faith and credit. Without some constitutional limitation it would be within the power of the legislature, at its will, to change the political and judicial districts in this State as might seem best to it. The people, by the constitution of 1870, having defined the seven supreme judicial districts by specifically mentioning the counties comprising the same, followed such enumeration by the declaration: "The boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time; but whenever such alterations shall be made, the same shall be upon the rule of equality of population, as nearly as county boundaries will allow, and the districts shall be composed of contiguous counties in as nearly compact form as circumstances will permit. The alteration of the districts shall not affect the tenure of office of any judge."

At the time this constitution was adopted there were three judges of the Supreme Court already serving whose terms had not expired, and the constitution provided for a vote for four of the seven judges, to which the number was increased by it, to be held at the same time that the vote upon its adoption should be taken. Thus we are to know that the framers of the constitution had before them the fact that the terms of the seven judges would never expire at the same time, and if the strict words of its provision, that the districts could only be changed at the session of the General Assembly "next preceding the election for judges therein, and at no other time," are literally construed, then it is perfectly apparent that there could be no re-apportionment of all the districts in the State had at any session of the General Assembly. Such a construction would deny to the legislature the power to change the boundaries of districts at any time.

By a natural reading and ordinary construction of the language, the expression, "the election for judges therein," would necessarily and naturally mean the election of the judge or judges in the district or districts thus changed or to be changed, whether such legislation was had at the session of the General Assembly preceding the time when but one judge was to be elected or at the session preceding the time of the election of five of the judges. If an apportionment of all the districts should be made at a time when judges were to be elected in five districts, only, of the State, there would be two districts in which no judges were to be elected therein at the election following the session at which such apportionment was made,—a situation certainly not contemplated by the framers of the constitution, in view of the constitutional declaration that the boundaries of a district should be changed only by the legislature in session immediately preceding the election of a judge therein, and at no other time. That the execution of the power to change the boundaries of any district may result in incidental changes in other districts is well established, as shown in the opinion of Mr. Chief Justice HAND.

No one can or does contend it was the intent of the framers of the constitution that the districts formed by them, as specified in the organic instrument, should never be changed. Section 5 of article 6 of the constitution declares that "the boundaries of the districts may be changed at the session of the General Assembly next preceding the election of judges therein." The plain and natural meaning of the language of this section is, that the General Assembly convened in regular session next preceding the expiration of the term of office of any supreme judge or judges may re-arrange the boundaries of the district or districts in which such judge or judges is or are to be elected.

The suggestion that as the terms of office of the different judges of the Supreme Court do not expire at the

same time, the boundaries of districts can be changed only by the legislature which is in session next preceding the time fixed for the election of the greater number of the judges, involves the necessity of holding that the boundaries of districts Nos. 4 and 5 cannot be changed immediately prior to the time fixed for the election of judges in those districts, but that the boundaries of those districts can only be changed at some other time than immediately preceding the election of judges in those districts, notwithstanding the positive declaration of the constitution that the boundaries of supreme judicial districts may be changed only at the session of the General Assembly next preceding the election of judges therein, and at no other time. We cannot consent to thus abrogate the manifest purpose and intent of the constitution by mere refinement of construction. The reasoning in support of such a construction is more largely in the nature of an earnest protest against what the advocate believes to be an unfair and unjust enactment than an argument against the power to pass the statute.

The further limitation upon the power to change the boundaries of a judicial district is, that when such alterations are made "the same shall be upon the rule of equality of population, as nearly as county boundaries will allow, and the districts shall be composed of contiguous counties, in as nearly compact form as circumstances will permit." The preamble of the act purports to declare its purpose, and states that the fourth district, as it originally existed, had 100,000 less population than any other district in the State, and the declared purpose of the legislative body was to increase the population of the district to more nearly equalize it. In attempting to reach that end the legislature took from the old district two counties having a population of 42,050 and added four counties having 110,193 population, so that the net result was the adding of about 68,000 population to the district as re-organized. If it be conceded that the legis-

lature had the power to change the boundaries of the district at all, then, if it kept within the limitations of the constitution as to equality of population, contiguity and compactness, its action must be upheld. The law does not require absolute equality in population or absolute compactness. The requirement that a county can not be placed part in one district and part in another is imperative, and therefore only such equality in population and compactness in form can be attained as county boundaries and the "circumstances will permit." That the population of the district was increased is not questioned; that the counties are contiguous is evident upon inspection, and the condition as to compactness is, that it shall be as nearly compact as "county boundaries will allow" and "circumstances will permit." An approximation to compactness may be all that is attainable. This work is cast upon the legislative body, and it is its duty to exercise its discretion in performing it, and it is not subject to the supervision of this court unless, as was declared to be the rule in *People ex rel.* v. *Thompson,* 155 Ill. 451, the principles of compactness or equality of population have been wholly disregarded. In the case last cited, which was an original proceeding in this court to test the constitutionality of an act adopted by the General Assembly at the session held in 1893, apportioning the State into Senatorial districts and wherein we held the enactment to be constitutional and valid, in reply to the insistence the act violated the requirement of compactness, we said (p. 480): "Who, then, must finally determine whether or not a district is as compact as it could or should have been made? Surely not the courts, for this would take from the legislature all discretion in the matter and vest it in the courts, where it does not belong, and no apportionment could stand unless the districts should prove as compact as the judges might think they ought to be or as they could themselves make them. As the courts cannot make a Senatorial apportionment di-

rectly, neither can they do so indirectly. There is a vast difference between determining whether the principle of compactness of territory has been applied at all or not, and whether or not the nearest practical approximation to perfect compactness has been attained. The first is a question which the courts may finally determine; the latter is for the legislature." And in the same case, in holding the act then under consideration could not be declared invalid on the ground the requirement of equality of population had been violated, we said (p. 477): "If it clearly appeared that in the formation of any district the requirement of compactness of territory and equality in population had been wholly ignored had not been considered or applied at all, to any extent, then the statute would be clearly unconstitutional. But if it has been considered and applied, though to a limited extent only, subject to the other more definitely expressed limitations [the integrity of counties, contiguity and compactness of territory,] then the General Assembly has not transcended its power, although it may have very imperfectly performed its duty, and the act is valid."

It is likewise within the scope of legislative power to determine the method it will follow in reaching the objects it has in view, and if, in the legislative mind, in order for the proper performance of its duty, it was necessary or proper to take from the old district the counties of Scott and Pike at the south and add to the district four counties on the north, it is not within the power of this court to say that it should have reached and accomplished the object in view in some other manner, for that would be to seize legislative power and to exercise it. If the legislature keeps within the limitations of the constitution, the details of the execution or performance of its duties or the motives that prompt it in adopting the various modes are exclusively matters of its own, with which the courts have no power and have no right to interfere. This court has no more authority to direct the

legislature how it shall proceed in matters within its constitutional discretion than has the legislature the power to direct this court how it shall consider and dispose of the cases submitted to it for decision. Each body is a co-ordinate, independent branch of the government, and while the courts are given power to review the action of the legislature, they may do so only to the extent of determining whether it has contravened the provisions of the constitution or exceeded its authority. To do otherwise the court would usurp legislative power and assume the authority to make the laws by which the people are to be governed.

From the earliest day of the establishment of our form of government the sentiment existed, and has continuously grown, that there must be no encroachment by one branch of the government upon the authority and powers of another. If such practice were recognized, the orderly and harmonious operation of the different departments of the State government would be interrupted and finally destroyed, and one of the departments would usurp all power and all authority. It may be that the legislation here under consideration was prompted by motives of political advantage, and an analysis of the political conditions of this district before the change and its political condition as changed, taking into consideration the method adopted for increasing the population of the new district by deducting 42,050 and adding 110,000, gives force to the argument. But if such be the case, no power is thereby conferred upon this court to declare the act unconstitutional. If the legislature has power to adopt the statute, we are to regard the enactment as the action of the people and obey it as the law of the land. That the legislators were moved by improper motives, and that we may believe the statute to be ill-advised and that its operation will be antagonistic to the welfare of the people, has no potency to vest us with authority to denounce an act to be illegal. To

do so would be to arrogate to the judiciary the power to determine for the people what laws should be adopted for their well being and government,—an authority which no free people will ever yield to the judicial department or to any other than those whom they have deputed and expressly authorized to make laws for them. This power lies at the root of self-government, and will always be retained in their own hands by a free and liberty-loving people.

In our capacity as citizens of the State we may regard any act of the legislature under consideration as unwise and mischievous, as detrimental to the best interest of the State and the people thereof, as intended only to unjustly advance the partisan purposes of a political party, and as wholly unjustifiable on any ground of fairness or patriotism, and yet, as judges, we may find no reason for declaring the General Assembly was without legal power to pass the enactment. As was said by Mr. Justice SCHOLFIELD in *Wilson* v. *Board of Trustees*, 133 Ill. 443: "The legislation may be unwise, improvident, and even vicious, but it does not follow it is unconstitutional." In *Chicago, Danville and Vincennes Railroad Co.* v. *Smith*, 62 Ill. 268, Mr. Justice THORNTON, speaking for this court, said (p. 271): "In the discussion of legislative power we have nothing to do with questions of policy or expediency. The constitution has created the legislative and judicial departments,—the one to make the law, the other to construe and administer it. It may be ·mischievous in the effects, burdensome upon the people, conflict with our conceptions of natural right, abstract justice or pure morality, and of doubtful propriety in numerous respects, and yet we would not be justified to hold that it was not within the scope of legislative authority for such reasons." The author of the article on Constitutional Law in 6 Am. & Eng. Ency. of Law, (2d ed.) p. 1081, says: "With the wisdom or expediency of a law the judiciary has nothing to do. Such questions address themselves

solely to the law-making department of the government." And the same author remarks: "It is not within the province of the judiciary to inquire into the motives actuating the law-making body."

If the General Assembly adopts a statute which is clearly not within its power to enact, this court may so declare and annul it. But if the legislature has the power to adopt the statute, and in doing so acts unwisely and is not governed by patriotic motives, or the legislative action is prompted by mere partisanship and not from a just and patriotic intent to benefit the public, the remedy is not an appeal to this court, for the people have not yielded to the judiciary the right and power to determine as to the wisdom or expediency of the laws by which they shall be governed. The authority to correct such vicious legislation is retained by the people, in whom rests the power to bring about a repeal of all statutes and correct every abuse in legislation.

Mr. JUSTICE MAGRUDER dissenting, as follows:

On April 21, 1903, the relator herein, William L. Vandeventer, filed his original petition in this court for a writ of *mandamus* against the respondent James A. Rose, Secretary of State.

The petition alleges that the fourth judicial district for the election of one of the judges of the Supreme Court of the State of Illinois, as fixed by the constitution of 1870, is composed of the counties of Fulton, McDonough, Hancock, Schuyler, Brown, Adams, Pike, Mason, Menard, Morgan, Cass and Scott; that at a convention of delegates of the democratic party in said fourth judicial district, composed of said twelve counties, in the city of Quincy in Adams county, on April 17, A. D. 1903, the relator was regularly nominated as the democratic candidate for the office of judge of the Supreme Court in and for said fourth judicial district to be voted for at the election of the judge of said court to be held on the first

Monday of June, A. D. 1903; that the relator or petitioner has accepted the nomination so made; that a certificate of said nomination was regularly prepared and signed and sworn to by the presiding officer and secretary of said convention in accordance with the statute; that, on April 18, 1903, such certificate was presented to the respondent, the Secretary of State, and the latter was requested to receive and file the same in his office, and to certify to the county clerk of each of the counties, composing said fourth judicial district, the name of petitioner, etc., pursuant to the statute in such case made and provided; but that the respondent refused to accept or file said certificate or certify the name of the petitioner, and the description of the office as specified in the certificate; that by such refusal of the respondent, etc., the petitioner is denied the right to have his name as a candidate for said office placed upon the ballots to be voted by the voters of said district at said election.

The prayer of the petition is, that a writ of *mandamus* be issued, directed to the respondent as such Secretary of State, requiring him to receive the said certificate of nomination, and file the same, and certify to each county clerk in the counties of said district the name of petitioner and the description of the office, etc., as required by the statute. On April 22, 1903, the respondent filed an answer to said petition, admitting that the relator had been duly nominated in what formerly comprised the fourth judicial district of Illinois, but denied that said fourth judicial district is now composed of the twelve counties named in the petition, but avers that said district now comprises the counties of Rock Island, Mercer, Warren, Henderson, Fulton, McDonough, Hancock, Adams, Schuyler, Brown, Mason, Menard, Morgan and Cass; and that the boundaries of said original fourth judicial district were changed by virtue of an act of the General Assembly of the State of Illinois entitled "An act changing the boundaries of the Fourth Supreme Court

District of the State of Illinois, and thereby affecting the boundaries of other districts therein named and providing for an election in said fourth district," approved by the Governor on April 3, 1903, and filed in the office of the Secretary of State. The answer admits that the respondent refused to accept and file the certificate of nomination because of such change in said district. The answer further alleges that the first election of a Supreme Court judge in said original fourth judicial district after the adoption of the constitution of 1870 was held on June 5, 1876.

The act of April 3, 1903, referred to in the answer is as follows:

"Whereas, the constitution of this State provides that the boundaries of the districts for the election therein of judges of the Supreme Court may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time; and, whereas, there will be held an election for a judge of the Supreme Court in the said Fourth Supreme Court District on the first Monday of June, 1903, under the constitution of this State; and, whereas, said Fourth Supreme Court District has a less number of inhabitants by more than 100,000 according to the census of 1900, than any other one of the seven districts for the election of supreme judges in the State of Illinois, therefore,

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That the boundaries of the said Fourth Supreme Court District are hereby changed so that after the passage of this act, said district shall be composed of the following counties, to-wit: Rock Island, Mercer, Warren, Henderson, Fulton, McDonough, Hancock, Adams, Schuyler, Brown, Mason, Menard, Morgan and Cass.

"Sec. 2. After the passage of this act, said county of Rock Island shall cease to be a part of the sixth judicial district for the election of supreme judge and shall con-

stitute a part of said fourth district as hereinbefore provided; said counties of Mercer, Warren and Henderson shall cease to be a part of the fifth district for the election of supreme judge and shall constitute a part of said fourth district as hereinbefore provided; and said counties of Pike and Scott shall cease to be a part of said fourth district and are added to, and shall form a part of the second district for the election of supreme judge.

"Sec. 3. On the first Monday of June, A. D. 1903, and every nine years thereafter as provided by law, there shall be elected a judge of the Supreme Court in said fourth district as composed of the counties mentioned in section 1 of this act."

The following plat or diagram shows the boundaries of the fourth judicial district as it existed before the changes made by the act of April 3, 1903:

The following plat shows the boundaries and dimensions of the fourth judicial district after the changes made by the act of April 3, 1903:

On April 22, 1903, a written stipulation was filed by the relator and the respondent, agreeing that, upon the hearing of this cause, the question for the determination

of this court is the constitutionality of said act of April 3, 1903; that the copy of said act as above set forth is a true copy of the same as passed by the legislature; and that the first election of a Supreme Court judge in the fourth district after the adoption of the constitution of 1870 was held on June 5, 1876. On April 22, 1903, the present case, involving the constitutionality of said act, was argued orally before the court by the counsel of the respective parties; and written, but not printed, arguments, involving the substance of what was said in the oral arguments, have since been filed in the cause.

On April 23, 1903, an order was entered by the court denying the writ of *mandamus* prayed for in the petition. This action of the court in denying the writ was concurred in by a majority of the members of the court. I differed from the other members of the court in regard to the views entertained by them upon this subject, and dissented from the conclusion reached by them which resulted in denying the writ. The reasons, which have led me to a non-concurrence in the action so taken by the majority of the court, are as follows:

Section 5 of article 6 of the constitution of 1870 provides that "the present grand divisions shall be preserved, and be denominated southern, central and northern, until otherwise provided by law. The State shall be divided into seven districts for the election of judges, and until otherwise provided by law they shall be as follows:

"*First District.*—(Naming twenty-four counties).

"*Second District.*—(Naming nineteen counties).

"*Third District.*—(Naming sixteen counties).

"*Fourth District.*—The counties of Fulton, McDonough, Hancock, Schuyler, Brown, Adams, Pike, Mason, Menard, Morgan, Cass and Scott. (Being twelve counties).

"*Fifth District.*—The counties of Knox, Warren, Henderson, Mercer, Henry, Stark, Peoria, Marshall, Putnam, Bureau, LaSalle, Grundy and Woodford. (Being thirteen counties).

"*Sixth District.*—The counties of Whiteside, Carroll, JoDaviess, Stephenson, Winnebago, Boone, McHenry, Kane, Kendall, DeKalb, Lee, Ogle and Rock Island. (Being thirteen counties).

"*Seventh District.*—(Mentioning five counties).

"The boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time; but whenever such alterations shall be made, the same shall be upon the rule of equality of population, as nearly as county boundaries will allow, and the districts shall be composed of contiguous counties, in as nearly compact form as circumstances will permit. The alteration of the districts shall not affect the tenure of office of any judge."

Section 6 of article 6 of the constitution of 1870 provides in part as follows: "At the time of voting on the adoption of this constitution, one judge of the Supreme Court shall be elected by the electors thereof, in each of said districts numbered 2, 3, 6 and 7, who shall hold his office for the term of nine years from the first Monday of June, in the year of our Lord 1870. The term of office of judges of the Supreme Court, elected after the adoption of this constitution, shall be nine years; and on the first Monday of June of the year, in which the term of any of the judges in office at the adoption of this constitution, or of the judges then elected, shall expire, and every nine years thereafter, there shall be an election for the successor or successors of such judges, in the respective districts wherein the term of such judges shall expire." (1 Starr & Curt. Ann. Stat.—2d ed.—pp. 148, 149). Sections 2, 3 and 4 of article 5 of the constitution of 1848 provided that the Supreme Court should consist of three judges; that the State should be divided into three grand divisions as nearly equal as might be, and the qualified electors of each division should elect one of said judges for the term of nine years; and that the office of one of said judges should be vacated after the first election

held under said article 5 in three years; of one in six years, and of one in nine years. (1 Starr & Curt. Ann. Stat.—2d ed.—p. 78).

Article 6 of the constitution of 1870 recognized, and continued in force, the provisions of the old constitution of 1848 providing for the vacation of the office of one judge in three years, one in six years, and one in nine years. Accordingly, by section 10 of the Election law of 1872, the legislature provided as follows: "The judges of the Supreme Court shall hereafter be elected as follows, to-wit: In the first, second, third, sixth and seventh districts, on the first Monday of June, A. D. 1879, and every nine years thereafter. In the fourth district, on the first Monday of June, A. D. 1876, and every nine years thereafter. In the fifth district, on the first Monday of June, A. D. 1873, and every nine years thereafter." (Rev. Stat. 1874, chap. 46, sec. 10, p. 454).

It is conceded, that five judges of the court in five districts, to-wit, the first, second, third, sixth and seventh, are to be elected in June, 1906; that one judge is to be elected in the fourth district in June, 1903, and one in the fifth district in June, 1909. The act of April 3, 1903, was framed upon the theory, that the legislature has the power, under the constitution, to change the boundaries of one district at one time without changing the boundaries of the other districts at that time, except so far as such changes may be incidental to the alteration of the single district so changed. In my opinion, the constitution never contemplated a change in the boundaries of a single Supreme Court judicial district at one time, but contemplated that, when any change was made, all the districts should be involved and considered in such change. If it be assumed, however, that the constitution can be construed to confer the power to change one district at one time without changing the others except incidentally, the act of 1903 seems to me to be clearly unconstitutional. Its unconstitutionality is shown upon

the face of the act itself. Section 5 of article 6 of the constitution of 1870, as already quoted, provides that "the boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time." If these words are capable of the construction evidently put upon them by the framers of the act of April 3, 1903, that act is in contravention both of the spirit and letter of such words.

Section 2 of the act of April 3, 1903, provides as follows: "After the passage of this act, said county of Rock Island shall cease to be a part of the sixth judicial district for the election of supreme judge and shall constitute a part of said fourth district as hereinbefore provided." By taking the county of Rock Island, whose population is 55,249, out of the sixth judicial district, the boundaries of the sixth judicial district are thereby changed, and such change is made in 1903. But no election takes place in the sixth judicial district until June, 1906. A session of the legislature is to be held in 1905. The session of the legislature in 1905 is the session next preceding the election of a judge in the sixth judicial district. Therefore, to make the change in the boundaries of the sixth judicial district in 1903 is in express violation of the constitution, because, under the theory upon which the present act was framed, the change can only be made at the session of the General Assembly next preceding the election for judge. The session of 1903 is not the session next preceding the election of a judge in the sixth district. Only the session of 1905 is the session next preceding the election of a judge in the sixth district.

Again, section 2 of the act of April 3, 1903, further provides as follows; "Said counties of Mercer, Warren and Henderson shall cease to be a part of the fifth district for the election of supreme judge and shall constitute a part of said fourth district as hereinbefore provided." No election for supreme judge in the fifth district takes

place until June, 1909. The session of the legislature next preceding the election in the fifth district is the session of the legislature which meets in 1909. But, by the present act, a change is made in the boundaries of the fifth district by taking three counties out of the same at the session of the legislature of 1903, six years before any election in the fifth district, and six years before the session of the legislature next preceding the election in the fifth district. By thus changing the boundaries of the fifth district at a different time from that named in the constitution, the constitution is violated.

Again, section 2 of the act of April 3, 1903, provides as follows: "And said counties of Pike and Scott shall cease to be a part of said fourth district and are added to, and shall form a part of the second district for the election of supreme judge." It is conceded that no election takes place in the second district until June, 1906, and there will be a session of the legislature in 1905. The latter session of the legislature is the one next preceding the election to take place in the second judicial district. By adding the counties of Pike and Scott to the second judicial district, the boundaries of that district are changed, and such change is made, not in 1905, but in 1903, two years before the meeting of the legislature next preceding the election of a judge in the second judicial district.

Thus, in order to change the boundaries of the fourth judicial district, the boundaries of three other districts are changed, to-wit, those of the sixth district by taking the county of Rock Island out of it, and those of the fifth district by taking the counties of Mercer, Warren and Henderson out of it, and those of the second district by adding to it the counties of Pike and Scott. In support, however, of the action of the legislature in thus changing the boundaries of the fourth judicial district at this time, it is said that the changes, thus made in the sixth, fifth and second districts, are merely incidental to

a changing of the boundaries of the fourth district, and such alterations are justified upon this ground. But section 5 of article 6 of the constitution of 1870 further provides as follows: "But whenever such alterations shall be made, the same shall be upon the rule of equality of population, as nearly as county boundaries will allow, and the districts shall be composed of contiguous counties in as nearly compact form as circumstances will permit." Therefore, whenever an alteration of the boundaries of a district is made, it must be upon the rule of equality of population as nearly as county boundaries will allow. The act of April 3, 1903, professes upon its face to have for its object the equalization, as nearly as possible, of the population of the fourth district with the populations of the other districts. In the preamble of the act the following recitation is made: "Whereas said Fourth Supreme Court District has a less number of inhabitants by more than 100,000 according to the census of 1900, than any other one of the seven districts for the election of supreme judges in the State of Illinois." As, according to the preamble, the fourth district is less in population than the other districts by more than 100,000 inhabitants, an equalization of its population with those of the other districts would require an addition to its population of something like 100,000. This is apparent upon the very face of the act itself. Instead, however, of adding to the population of the fourth district in order to produce the desired equalization, the act proceeds at once to take out of the fourth district the two counties of Pike and Scott, whose population is 42,050, and to add them to the second district. Then, in order to equalize the district, as thus reduced by a deduction of 42,050 inhabitants from its population, four counties are taken from the fifth and sixth districts and added to the fourth district. The population of these four counties, to-wit, Rock Island county from the sixth district, and Mercer, Warren and Henderson counties from the fifth

district, is 110,193, the population of Rock Island county
being 55,249, of Mercer county being 20,945, of Hender-
son county being 10,836, and of Warren county being
23,163. But 110,193 inhabitants were not added to the
population of the fourth district by the annexation of
these four counties thereto, because Pike and Scott coun-
ties were taken out of the district, and the population
of Pike and Scott counties was 42,050. If 42,050 be de-
ducted from 110,193, the remainder is 68,143. Therefore,
the only addition made to the population of the fourth
district by the act of April 3, 1903, was 68,143, less than
the amount which, according to the statement in the
preamble, was required to equalize the fourth district,
as nearly as might be, with the other districts.

It is true that courts cannot inquire into the motives
which prompt legislative action, but the constitution
provides that the alterations of the boundaries must be
upon the rule of equality of population, and when this
court, which is empowered under the constitution to pass
upon the validity of an act of the legislature, can see
upon the face of an act that its purpose was not to carry
out the rule of equality of population, it is the duty of the
court, as it seems to me, to pronounce the act invalid.
It cannot be said that, if the fourth district was less in
population by more than 100,000 than the other districts,
it was necessary to deduct 42,050 from its population and
then add 110,193 thereto. Why were not Pike and Scott
counties with their population of 42,050 allowed to re-
main a part of the fourth district in accordance with the
provision of the constitution, which put them there, and
a sufficient amount of population added to the fourth dis-
trict with Pike and Scott counties in it to bring the dis-
trict up to an equality with the populations of the other
districts, as nearly as such equalization could be accom-
plished? In other words, instead of deducting and then
adding, as was done here, why was not the addition made
without any deduction? The conclusion is irresistible,

that the object of this act was not so much to equalize the population of the fourth district with the other districts, as it was to get rid of the counties of Pike and Scott.

"While the legislature is allowed considerable latitude in making the apportionments, the discretion reposed in it is liable to great abuse, and must be fairly and honestly exercised. If, in making the apportionment, there is so wide a departure from the constitutional rules as to compactness and numerical equality in population, that it cannot possibly be justified by the exercise of any judgment or discretion, but evinces an intention on the part of the legislature to utterly ignore and disregard the rules of the constitution, in order to promote some other object than a constitutional apportionment, the apportionment is unconstitutional and void." (2 Am. & Eng. Ency. of Law,—2d ed.—p. 484). It seems to me that the language above quoted is precisely applicable to the case in hand. It follows that, even if the legislature has the power under the constitution to change the boundaries of one district at one time, more changes have been made under the act of April 3, 1903, in other districts than the fourth district, than can be regarded, by any process of reasoning, as necessary incidents to the alteration sought to be effected in the fourth district.

One of the results, following from the act of April 3, 1903, is substantially to disfranchise the voters of Pike and Scott counties, at least for a period of three years. In 1903 the voters of Pike and Scott counties should vote for the election of a judge of the Supreme Court in the fourth district. But as the act of 1903 now annexes those counties to the second district, they will have no opportunity of voting for a judge of the Supreme Court before 1906 when the second district elects a Supreme Court judge. The people of these counties, instead of being allowed to vote for a Supreme Court judge once in a period of nine years, are deprived of the privilege of voting except once in twelve years. The opposite effect takes

place in regard to the people in the counties detached from the sixth and fifth districts. The voters of the county of Rock Island in the sixth district cast their ballots for a judge of the Supreme Court in 1897, and, as that county is now added to the fourth district, the voters in that county have the privilege of casting their votes for a judge of the Supreme Court in 1903, within a period of six years; that is to say, they are given the privilege of voting twice for judge of the Supreme Court within a period of six years. The voters in the counties of Mercer, Henderson and Warren cast their ballots for a judge of the Supreme Court in 1900, and now, by virtue of their annexation to the fourth district, they are given the privilege of again casting their ballots for a judge of the Supreme Court in 1903, that is to say, they are allowed to vote for a judge of the Supreme Court twice in three years, instead of once in nine years as was contemplated by the constitution.

But, in my opinion, the constitution never contemplated an alteration of the boundaries of the Supreme Court judicial districts unless such alterations were made in all the districts at one time. The object of the constitution of 1870 was to divorce the elections for supreme judges in the seven judicial districts from politics as much as possible. This is shown by the debates, which took place in the constitutional convention when sections 5 and 6 of article 6 of the constitution of 1870 were adopted. A proposition was made to have the election for the additional judges, provided for in the constitution of 1870, take place at the regular November election in the State; but this was voted down upon the express ground that the election at that time was for officers of a political character, and that the judicial election ought to be at a different time, to-wit, in June, instead of in November. This wholesome divorcement of the highest judicial tribunal in the State from political influence can not be secured if the legislature, at any session when it

sees fit, can change the boundaries of one only of the Supreme Court judicial districts. If it has such power, then at the next election it can keep a favorite judge in power by changing the district so as to give it such a political complexion as will insure that result. On the other hand, if it is desired to retire a judge from the bench, it can accomplish that result in the same way by so changing his district as will give it such a political complexion as to accomplish his defeat. These unfortunate results will not be so apt to occur if the constitution is so construed as to require the apportionment of population in all the seven districts to take place at the same time. My reasons for thinking, that such was the intention of the constitution, are as follows:

Section 5 of article 6 of the constitution of 1870 says: "The boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges therein, and at no other time." It is not said here, that the boundaries of *each* of the districts may be changed at the session of the General Assembly next preceding the election for *a judge* therein. On the contrary, the plural is used all the way through. The boundaries of the districts may be changed. What districts? The seven districts just mentioned in section 5. That is to say, the boundaries of all the seven districts together and at one time may be changed. The language used is "the election for judges therein." What judges? The seven judges to be elected in the seven districts. There is no statement, that there is to be an election for each judge in each of the seven districts. Again, when may the boundaries of the districts be changed? "At the session of the General Assembly next preceding the election for judges therein." The singular is used when the session of the General Assembly is referred to, and the meaning evidently is, not that one district is to be changed at one session of the legislature and another district at another session of the legislature, but that the boundaries of all

203—6

the districts are to be changed at one and the same session of the legislature next preceding the election for judges therein. The clear meaning, to my mind, of the constitution is, not that the legislature has no power to re-apportion the judicial districts, but that, when they do re-apportion them, the alterations of the boundaries of the districts must be all made together at one time and at the same session of the legislature. Only thus can the rule of equality of population be observed and carried out. Again, section 5 contains the following words: "But whenever such alterations shall be made, the same shall be upon the rule of equality of population, as nearly as county boundaries will allow, and the districts shall be composed of contiguous counties, in as nearly compact form as circumstances will permit. The alteration of the districts shall not affect the tenure of office of any judge." Here, again, the plural is used. The words are "such alterations," that is, the alterations of all the districts, not the alteration of one district. "The districts shall be composed of contiguous counties." Here, the plural is again used, showing that the alterations, which are to take place, are to be alterations of the districts, and not of one district, or of each district at one time. Again, the constitution does not say that the alteration of a district shall not affect the tenure of office of one of the judges, but it says that the alteration of the districts, that is, the alteration of all the districts at one time shall not affect the tenure of office of any one of the seven judges.

It is true, that five judges are elected at one time, and two of the other judges are elected at different times. For example, in June, 1906, elections will take place for judges of the Supreme Court in five districts, to-wit, the first, second, third, sixth and seventh; but the election in the fourth district takes place in June, 1903, and the election in the fifth district in June, 1909. Section 6 of the constitution recognizes this state of things. That is

to say, section 6 recognizes the fact that five judges are elected at one time, and the other two at different times from each other and from the other five. In view of this it is claimed that, unless the boundaries of the fourth and fifth districts can be changed at a different time from those, at which the other five districts are changed, they cannot be changed at all. This contention is based upon the statement in the constitution that the changes must be made at the session of the General Assembly next preceding the election for judges therein, and upon the fact that the session of the General Assembly next preceding the election of the judge in the fourth district is at a different time from the session of the General Assembly next preceding the election for a judge in the fifth district, and at a different time from the session next preceding the election of judges in the other five districts. This difficulty, however, disappears upon the application of a well established rule of statutory and constitutional construction.

Sections 5 and 6 of article 6 of the constitution of 1870 are to be construed together. There is apparently a conflict or inconsistency between their provisions, because the session of the General Assembly next preceding the election for judges in five districts is at a different time from the sessions of the General Assembly next preceding the elections for judges in the fourth and fifth districts. It is not necessary to conclude that this fact was overlooked by the framers of the constitution. The provision in the sixth section is to be regarded as an exception to the provision contained in the fifth section. It was the intention of the constitution that, whenever changes were made in the districts, they should be made at the session of the legislature next preceding the election for the five judges, or, in other words, for the election of the majority of the judges.

In the construction of constitutional and statutory provisions "one provision may be qualified by another,

though it does not profess to have that effect. Words expressive of a particular intent incompatible with other words expressive of a general intent will be construed to make an exception, so that all parts of the act may have effect. The context may thus serve to engraft an exception by implication to dispose of an apparent conflict. * * * But, in the nature of things, contradictions cannot stand together. Where there is an act or provision which is general, and applicable actually or potentially to a multitude of subjects, and there is also another act or provision which is particular and applicable to one of these subjects, and inconsistent with the general act, (or provision), they are not necessarily so inconsistent that both cannot stand, though contained in the same act. * * * The general act would operate according to its terms on all the subjects embraced therein, except the particular one which is the subject of the special act. That would be deemed an exception." (Sutherland on Statutory Construction,—ed. of 1891— secs. 216, 217; *Stockett* v. *Bird,* 18 Md. 484; *Crane* v. *Reeder,* 22 Mich. 322; *State* v. *Goetze,* 22 Wis. 348; *Long* v. *Culp,* 14 Kan. 317; *Pretty* v. *Solly,* 26 Beav. 606).

Under the rule of construction above announced, the provision in the sixth section for the election of judges in the fourth and fifth districts must be regarded as an exception to the rule, announced in the fifth section. The fifth section announces the rule, that the boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges therein. The exception to this rule is the provision embodied in section 6, that is to say, the changes of the boundaries of the fourth and fifth districts may be made at a session of the legislature, which is not the next preceding session to the election for judges in those districts. The provision for the changing of the boundaries in the fourth and fifth districts is an exception to the rule, that the changes must be made in the boundaries

of the districts at the session of the General Assembly next preceding the election for judges. The provision in section 5 is general and applicable to a multitude of subjects, that is, to a number of districts. The provision in section 6 is particular, and is applicable to only two of those subjects, and seems to be inconsistent with the general rule laid down in section 5; but that inconsistency or conflict disappears when the provision in section 6 is regarded, under the rule of construction already stated, as an exception to the general rule stated in section 5. That is to say, the boundaries of the districts may be changed at the session of the General Assembly next preceding the election for judges in the districts, except in the case of the fourth and fifth districts, and, in their case, the changes may be at a session of the General Assembly, which does not precede the election for judges in those districts. The apparent conflict or inconsistency in the constitution is thus made to disappear. In order that the general rule announced may be carried out, an exception will so far be made in case of the fourth and fifth districts, as to exempt them from the necessity of having their boundaries changed at the sessions of the General Assembly next preceding the elections in those districts. In this way, as it seems to me, the two apparently conflicting clauses of the constitution may be harmonized. It is not necessary that the boundaries of the fourth and fifth districts should be changed at sessions of the General Assembly next preceding the elections therein, but such boundaries may be changed at a session of the legislature which does not immediately precede the elections in those districts. In other words, the rule announced as applicable for the majority of the districts does not apply to the fourth and fifth districts, but they are excepted from that rule, and the provision in regard to them must be regarded as an exception to the rule.

It seems to me clear, therefore, that the constitution intended that, whenever changes are made by the legis-

lature in the boundaries of the districts, they should all be made at the same time, and such time must be the session of the legislature immediately preceding the election in the majority of the districts, to-wit, the first, second, third, sixth and seventh.

If the rule is to obtain, that the legislature can change one district at one time without making any change in the other districts except so far as such changes may be necessarily incidental, then there is nothing to prevent the legislature from passing a law, changing one of the five districts, in which an election occurs in 1906, without changing the boundaries of any of the other of such five districts. Under the rule contended for, any one of the first, second, third, sixth, and seventh districts may, alone and by itself, be changed as to its boundaries without any change being made in the others. Such, in my opinion, was never the intention of the constitution.

The rule, embodied in the foregoing quotation from Sutherland on Statutory Construction, is otherwise expressed by Dwarris on Statutes, as quoted in *Stockett* v. *Bird*, 18 Md. 488, in the following words: "When a general intention is expressed in a statute, and the act also expresses a particular intention, incompatible with the general intention, the particular intention is to be considered in the nature of an exception." Here, the general intention of the framers of the constitution of 1870, as shown by section 5 of article 6 of that instrument, is that the boundaries of the districts shall be changed at the session of the General Assembly next preceding the election for judges in all the districts; and this assumes it to be true that the election of judges in all the districts takes place at the same time. But the sixth section of article 6 of the constitution recognizes the fact that the elections in the fourth and fifth districts are not to take place at the same time with the elections in the other five districts, but at different times. Hence, the particular intention, expressed by section 6, is incompatible with

the general intention expressed in section 5, because the boundaries of the fourth and fifth districts cannot be changed at the session of the General Assembly next preceding the election for judges in those two districts, if the boundaries of all the districts are to be changed at the same time. Consequently, the particular intention, manifested in section 6, is to be considered in the nature of an exception. That is to say, the boundaries of the fourth and fifth districts need not be changed at the sessions of the General Assembly next preceding the elections for judges in those two districts, but may be changed at a session of the General Assembly, which does not precede the election for judges in those two districts. The fourth and fifth districts are exceptions to the general rule, in that their boundaries may be changed at a different session of the legislature from that which precedes the elections in those districts. It follows that the boundaries of the fourth and fifth districts may be, and must be, changed at the same time at which the boundaries of the other five districts are changed, to-wit, at the session of the General Assembly next preceding the election of judges in such five districts, and not at any session or sessions of the legislature next preceding the election for judges in the fourth and fifth districts.